950 So.2d 583 (2007)
STATE of Louisiana
v.
Darrell D. DRAUGHN.
No. 2005-KA-1825.
Supreme Court of Louisiana.
January 17, 2007.
Rehearing Denied March 30, 2007.
*589 Capital Appeals Project, Jelpi P. Picou, Jr., New Orleans, Letty S. DiGiulio, for Appellant.
Charles C. Foti, Jr., Attorney General, Paul Carmouche, District Atty., Catherine M. Estopinal, Michael A. Pitman, Asst. Dist. Attys., for Appellee.
TRAYLOR, Justice.
On December 12, 2000, a Caddo Parish grand jury indicted the defendant, Darrell D. Draughn, for the April 10, 2000 first degree murder of Lauretta White,[1] in violation of La. R.S. 14:30. Trial commenced with jury selection beginning on June 17, 2003. On June 27, 2003, the jury returned a unanimous verdict of guilty as charged. After a penalty phase hearing, the same jury unanimously recommended a sentence of death after finding the following aggravating circumstances: (1) that the defendant was engaged in the perpetration or attempted perpetration of an armed robbery, first degree robbery or simple robbery; and (2) that the offense was committed in an especially heinous, atrocious or cruel manner. On May 17, 2004, after denying post-verdict motions, the trial court imposed the sentence of death in accordance with the jury's verdict.
The defendant now brings the direct appeal of his conviction and sentence to this court pursuant to La. Const. art. 5, § 5(D)[2] raising 27 assignments of error. For the reasons that follow, we find that none of the arguments put forth constitute reversible error, and affirm the defendant's conviction and sentence.

FACTS AND PROCEEDINGS BELOW
On April 6, 2000, a Thursday, Cornell White dropped off his 64-year old mother, Lauretta White, at her residence at 228 East Boulevard Street in Shreveport, Louisiana. Before he left, Ms. White gave her son her social security check and some *590 cash to deposit for her but kept a $20 bill, which he saw her put in her wallet. She told her son that she would not need more money than that because she was just going to stay at her house that weekend.
On Monday morning, April 10, 2000, Mr. White returned to his mother's residence to pick her up to take her to a baby-sitting job. He was later than normal and was surprised that his mother had not tried to contact him on his beeper. When he reached his mother's house, he saw that the curtains had not been opened and the side door to the kitchen was left open a crack. Mr. White became concerned for his mother because both of these circumstances were unusual.
When Mr. White eased open the kitchen door, he found the body of his mother lying on the kitchen floor in a pool of blood. Her glasses were lying on the floor away from her body. Further into the house, her purse was on the floor near the hallway in the living room. The purse's contents were lying on the floor, the wallet and checkbook open flat on the floor. The wallet contained no money, credit cards or checks. Mr. White called 911 from the telephone in his mother's house and then waited outside for the police to arrive.
An autopsy showed that Ms. White had been stabbed or cut 61 times. Thirty-four of these stabbing and cutting wounds were on the head and face, with all but one of the cuts on the right side of her head. There were four stab wounds around her right eye. The autopsy showed that Ms. White could only see out of her right eye; her left eye was a glass eye.
In addition to the injuries to her head and face, the coroner found that Ms. White had stabbing and cutting wounds to her chest, abdomen and right foot. There were no wounds on her legs. There were multiple stabbing and cutting wounds of both arms and both hands, primarily on the palms of her hands. Three of the stab wounds were fatal; two of these cut the right jugular vein and one cut the right carotid artery.
In addition to the stabbing and cutting wounds, Ms. White's body showed several contusions and bruising. The coroner estimated Ms. White had been killed six to twelve hours before her body was found. Based upon the injuries she received, the coroner testified that Ms. White had been alive throughout the entirety of the attack, that she had numerous defensive wounds and that her injuries would have inflicted a great deal of pain and suffering.
Due to the great number of stab wounds, the police thought it likely that the assailant cut his hand, also, with the murder weapon. In their investigation of Ms. White's house, the police found drops of blood, later identified as being from a male, at eight locations throughout the house, away from Ms. White's body. Partial shoe prints were found in the victim's blood and on the carpet in her hallway.
After being informed that Ms. White would not have opened her door to a stranger, and observing that there were no signs of forced entry into her house, the police theorized that Ms. White must have known her murderer. The police asked for and received 19 voluntary DNA samples from Ms. White's family members, friends and neighbors. None of these DNA samples matched the perpetrator's bloodstains, and the investigation stalled.
Six months later, a detective received an anonymous tip stating that the defendant was involved in the murder of Ms. White. The defendant, a 29-year man who was one of Ms. White's neighbors, was located and brought in for questioning on October 26, 2000. After informing the defendant of his constitutional rights, the police asked him about Ms. White's murder. The defendant *591 denied ever having been in the victim's house but voluntarily submitted his DNA for testing.
The police received the results of the DNA testing on November 8, 2000. The DNA taken from the defendant matched the DNA found in Ms. White's house to an exclusion of other African American males in the statistical ratio of one in 430 trillion. After receiving the DNA results, the defendant was arrested for the murder of Ms. White. At that time, the police observed that the defendant had a noticeable scar on his right ring finger and that he was unable to stretch out that finger completely. The police found that the bloody shoe prints left at Ms. White's house were consistent with shoes the defendant had worn. The defendant again denied ever being in Ms. White's house and had no explanation for how his blood DNA was in her house. He claimed that he was at his grandmother's house, down the street from Ms. White's house at 240 East Boulevard Street, on the night Ms. White was murdered.
The state presented this evidence at trial and argued that Ms. White had been killed by the defendant during the robbery or attempted robbery of her house. The defendant presented an alibi defense through the testimony of his brother, great uncle, mother, grandmother and aunt, asserting that he had been at his grandmother's house, three houses down from Ms. White's house, the entire day and night before her body was found. The defendant did not take the stand. The defendant's brother testified that the shoes worn by defendant found similar to the shoe pattern at the murder scene were purchased after the murder took place. The defendant's family members testified that the defendant injured his right hand as a youngster. After considering all of the evidence presented, the jury unanimously found the defendant guilty of first degree murder.
The following day, the trial court held a hearing outside the presence of the jury to determine whether evidence of the defendant's involvement in an unadjudicated murder and aggravated battery could be admitted at the penalty phase of his trial, in addition to evidence of two prior convictions. After finding that the state's evidence of these unadjudicated crimes met a clear and convincing standard of proof, the trial court allowed limited evidence of the two unadjudicated crimes.
At the penalty phase hearing, the state presented clear and convincing evidence that the defendant committed the murder of 18-year old Justin Bradley on August 21, 2000, five months after Ms. White's murder. The jury heard evidence that the defendant shot Mr. Bradley in the wrist and back of the head with a shotgun. The state also presented clear and convincing evidence that the defendant committed aggravated battery of Willie Bush on October 25, 1999, a little over five months before Ms. White's murder. The jury was informed that the defendant attacked Mr. Bush and hit him on the head with a caulking gun.
The state also presented evidence of adjudicated crimes committed by the defendant through stipulations that the defendant had a misdemeanor conviction for possession of drug paraphernalia on November 28, 1989, and a felony conviction for possession of cocaine with intent to distribute on January 22, 1993. The state also presented victim impact evidence when it called Cornell White as a witness to testify about his mother and the impact of her death on her family members.
In the penalty phase, the defense called the defendant's grandmother, mother and aunt in the penalty phase to testify as to the pain the jury's verdict had caused *592 them and the sorrow they felt for the victim's family.
Following the penalty phase, the jury unanimously recommended that the defendant be sentenced to death, finding that the murder was committed in an especially heinous, atrocious or cruel manner and also that the murder was committed during the perpetration or attempted perpetration of armed robbery, first degree robbery or simple robbery.
The defense filed motions for new trial and for post-verdict judgment of acquittal. The trial court allowed the defense to obtain transcripts of trial proceedings in support of their motions. Thereafter, the trial court consider and denied the post-verdict motions, and formally sentenced the defendant to death.
The defendant now appeals his conviction and sentence urging 27 assignments of error.

LAW AND DISCUSSION
Sufficiency of the Evidence
Assignments of Error 1 and 4
The defendant claims that the evidence introduced by the state was insufficient to support a verdict of guilty of first degree murder. Specifically, the defense argues there was insufficient evidence to prove beyond a reasonable doubt that the murder was committed during the perpetration or attempted perpetration of a robbery because there was no evidence that anything of value was taken or attempted to be taken from Ms. White's house. In addition, the defense contends that the evidence supporting the inference that a robbery occurred was not worthy of belief because of the unreliability of the preservation of the crime scene by the police. In a related argument, the defense argues that the unreliability of the collection of the DNA evidence by the police, and the unreliability of its testing, makes the DNA evidence insufficiently reliable to form the basis of the defendant's first degree murder conviction.
In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Captville, 448 So.2d 676, 678 (La.1984). Additionally, where circumstantial evidence forms the basis of the conviction, the evidence must exclude every reasonable hypothesis of innocence, "assuming every fact to be proved that the evidence tends to prove." La. R.S. 15:438; see State v. Neal, XXXX-XXXX p. 9 (La.6/29/01), 796 So.2d 649, 657, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002). The statutory requirement of La. R.S. 15:438 "works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury." Neal, XXXX-XXXX p. 9, 796 So.2d at 657.
Under the circumstances of this case, in order to convict the defendant of first degree murder, the prosecution was required to prove beyond a reasonable doubt that the defendant specifically intended to kill or to inflict great bodily harm on the victim during the perpetration or attempted perpetration of armed robbery, first degree robbery or simple robbery. La. R.S. 14:30(A)(1).[3] Specific intent may be inferred *593 from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); Neal, XXXX-XXXX p. 10, 796 So.2d at 657.
Armed robbery is "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La. R.S. 14:64. First degree robbery is "the taking of anything of value belonging to another from the person of another, or that is in the immediate control of another, by use of force or intimidation, when the offender leads the victim to reasonably believe he is armed with a dangerous weapon." La. R.S. 14:64.1. Simple robbery is "the taking of something of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon." La. R.S. 14:65.
The state bore the burden to prove these elements, and to prove the identity of the defendant as the perpetrator. "As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification." Neal, XXXX-XXXX p. 11, 796 So.2d at 658; State v. Smith, 430 So.2d 31, 45 (La. 1983).
The perpetrator of this crime stabbed or cut Ms. White, a 64-year old woman, in her own home, a total of 61 times. The coroner testified as to her multiple stabbing and cutting injuries and the cause of her death. Specific intent to kill or inflict great bodily harm on Ms. White may be inferred from these circumstances.
The defense argues that there was insufficient evidence that something of value was taken from Ms. White, so that the underlying felony of robbery was not proved beyond a reasonable doubt. The defense points to testimony of Cornell White, the victim's son, who admitted that his mother could have spent the $20 that he knew she had with her when he last saw her. Mr. White also testified that there were items of value undisturbed in the house.
As this court held in State v. Neal, 275 So.2d 765, 770 (La.1973), whether or not anything of value was actually taken by the accused in an armed robbery context is a question of fact for the jury to weigh and evaluate in their consideration of the verdict. In Neal, an armed robber and his accomplice entered a gun shop and accosted the owner. The armed robber demanded the owner's wallet. When the owner handed over his wallet with one hand, he brought out a gun with the other hand and fired. The robber dropped the wallet and started to run away. The owner admitted on cross-examination that nothing was ultimately taken from his person or his shop. In affirming a conviction for armed robbery, this court held "that the slightest asportation of anything of value . . . the slightest deprivation for the slightest period of time . . . the slightest segregation of the property moved the slightest distance is sufficient to satisfy the element of a theft, which is part of the crime charged." Neal, 275 So.2d at 770. The court found that the jury, in weighing and evaluating the testimony, "chose to believe that indeed the robber did have, at some time if only momentarily, [the owner's] wallet in hand." Id.
*594 The same reasoning may be applied here. Although Ms. White's house was, in general, otherwise neat and tidy, the evidence showed that the perpetrator had moved through the house, closing curtains and opening drawers. A diagram was entered into evidence and explained by the testimony of one of the investigating officers. The diagram showed that the perpetrator's blood was found on the victim's robe on the living room floor near the purse and its contents. The robe not only contained the murderer's blood, but also a transfer stain, where a person had taken the robe and wiped it across existing blood on an object. Neither the purse nor the wallet, lying near the robe, had visible blood on them.
Blood droplets from the murderer reveal he walked down the hall toward the bedrooms of the house. A drop of blood was found on a bench in the victim's bedroom, as well as on the closed curtain and a pillow underneath the curtain. A blood drop from the perpetrator was also found in the bedroom across from the victim's bedroom at the foot of the bedspread. Blood from the perpetrator was found on a chair in the living room and on a rug found next to the victim. Drawers were left open in the living room and kitchen, and a chair was moved out of place in the guest bedroom.
The victim's purse, which was normally kept in her bedroom or den, was dumped on the floor of the living room by the hallway leading to the back of the house. Ms. White's wallet and checkbook were lying open on the floor and they contained no money, credit cards or checks. Cornell White testified that his mother had $20 in her wallet when he last saw her.[4] The victim's son admitted he did not know everything of value that was contained in his mother's house.
A rational juror, in weighing and evaluating the testimony, could have reasonably found proven beyond a reasonable doubt that Ms. White's $20 was taken from her. Moreover, the existence of a checkbook cover in her purse could lead a rational juror to infer that Ms. White possessed a checking account. No checks were found in the checkbook. The jury rejected the defense argument that Ms. White's purse may have been dumped out in the struggle. The jurors were allowed to use their common sense and experience to conclude that a purse's contents scattered by being knocked over do not land in the manner in which the checkbook and wallet were found. The jurors concluded the wallet and checkbook were handled and looked through.
Moreover, the murder of Ms. White allowed the perpetrator the leisure to move around her house, closing curtains for privacy, and possessing and assessing all of Ms. White's possessions, not just her wallet and checkbook. Undoubtedly, the perpetrator handled the contents of Ms. White's purse, whether there was any money in the purse to steal or not. Whether the perpetrator ultimately took anything of value belonging to Ms. White out of the house is irrelevant in this context. See Neal, 275 So.2d at 770. A rational juror could have found proven beyond a reasonable doubt that Ms. White was stabbed with a knife until she sustained fatal wounds so that her assailant could possess and search through her house for items of value.
The defendant claimed that the evidence here does not distinguish this case from *595 others where the murder was committed as part of a personal grudge or vendetta against the victim.[5] However, the difference here from cases cited by the defense is that the evidence proves the perpetrator walked through the victim's house after the victim was killed. If all that the murderer wanted to do was to kill Ms. White, there would have been no evidence of the perpetrator walking through her house, opening drawers and leaving blood droplets in the other areas of the house. Rather, this evidence of the perpetrator's actions after the murder are additional evidence that a robbery occurred.
Even if the jurors did not determine that a completed armed robbery had occurred, the evidence is clearly sufficient to support an attempted armed robbery. Attempted armed robbery is also an enumerated underlying felony within the definition of first degree murder. See La. R.S. 14:30(1). An attempt occurs when a person "having the specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object. . . ." La. R.S. 14:27(A). Under the definition of attempt, ". . . it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose." Id. Whether or not the perpetrator ultimately took anything of value from Ms. White, a rational juror could find that a person, having the specific intent to kill, performed various actions from which a specific intent to commit armed robbery may be found proved beyond a reasonable doubt. Here, the perpetrator entered the victim's house, stabbed or cut the victim 61 times until she bled to death, and moved throughout her house opening drawers and rummaging through the contents of her purse. We find that the element of first degree murder challenged here, that the murder was committed during the perpetration or attempted perpetration of armed robbery, was proven to a rational juror beyond a reasonable doubt.
In a related argument, the defense argues that the police had not preserved the crime scene adequately, so that it was impossible for the jury to determine whether or not robbery was the motive for the attack of Ms. White. In support of this argument, the defense showed the jury certain crime scene photographs with the victim's wallet closed and the checkbook in a different position from other photographs showing the wallet open and lying flat on the floor with the checkbook open flat beside it. The jury rejected the defendant's argument. The record shows that the testimony of the investigating officers, and of Cornell White, made clear that the original state of the checkbook and wallet was open flat on the floor. After the crime scene was photographed and videotaped, the police began their investigation. The investigating officers could not remember who had moved the wallet and checkbook, but the photographs taken after the investigation was underway, which show the wallet and checkbook as having been moved from their original positions, clearly show evidence markers. The jury rejected the defense's argument that the police had not adequately preserved the original crime scene.
The state's proof with regard to the identity of the perpetrator was compelling. From the stab wounds to Ms. White's body, it is apparent that the murderer knew Ms. White. The stab wounds to Ms. White's face and neck were almost exclusively to her right side. The evidence *596 proves she could only see out of her right eye. The perpetrator obviously knew this and did not want Ms. White to be able to identify him.
There was also evidence that Ms. White would not have opened her door to a stranger. Cornell White testified that his mother would only have opened her door to a relative or neighbor. He stated that the defendant had been living on the same street three houses down from his mother for almost thirty years.
The blood DNA recovered from the scene, other than the blood of the victim, was from the same person. Testing showed that the other blood had come from a male. DNA testing could not exclude the defendant as the donor of the DNA; more specifically, the probability of finding the same DNA profile if the DNA had come from an African-American male other than the defendant was 1 in 430 trillion.
The defense attempts to raise doubt as to the reliability of the collection of the DNA evidence, both at the scene, through their argument about the preservation of the crime scene previously discussed, and from the defendant, in an argument that the police investigators who obtained the buccal swab of the defendant's mouth had no specialized training to do so.
As to the reliability of the collection of DNA evidence at the scene, and from the defendant, the jury heard all of the circumstances of each and determined that the DNA collection was reliable. As to the reliability of the DNA evidence itself, the record shows that a hearing was held pre-trial on March 11, 2003 to determine the admissibility of the DNA evidence.[6] At trial, the state adduced expert testimony that the type of analysis and profiling used in this case, polymerase chain reaction or "PCR," is accurate and reliable. Testimony established that PCR analysis is commonly used in forensic investigations. The state's expert testified that the DNA analysis in this case was carried out with rigorous methodology, quality-assurance protocols, safeguards against contamination and peer review of each of the expert's findings.[7] This court has previously held that PCR DNA analysis is reliable and admissible under the standards established in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See State v. Edwards, XXXX-XXXX p. 28 (La.7/2/99), 750 So.2d 893, 910, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999). The defense raises no arguments which persuade this court to believe that the DNA evidence in this case was otherwise than accurate and reliable.
The defendant argues the alleged unreliability of the DNA evidence was all the more egregious considering the uncontroverted testimony he presented from several family members about his whereabouts on the day and night prior to the discovery of Ms. White's body. All of the defendant's testifying family members claimed to have seen him at some point throughout the day and night in question. However, none of them were with him for the entire time and each claimed to have been around him at different times. Even assuming that the defendant's family had flawless recollection of his whereabouts the day and night before Ms. White was discovered, a point the prosecution attempted to undermine through questioning, there was still a lengthy period of time during which the defendant was left alone.
*597 Balanced against this evidence of alibi was the state's evidence that the defendant's blood was found in Ms. White's house in eight locations, despite his claim that he had never been in her house. Moreover, Ms. White knew her attacker as evidenced by the fact that there was no forced entry into her house and by the pattern of the stab wounds. Viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to find proved that the defendant was the person who committed the first degree murder of Ms. White.
Finally, the defendant claims that the DNA evidence was uncorroborated by any of the state's other evidence. Specifically, the defendant argues that his evidence that the shoes, which the state claimed were similar to the shoe prints found at the scene, were purchased after Ms. White's murder, irreparably damages this corroborating evidence. In addition, the defendant argues that his family's testimony that the scar and injury to his right hand were sustained when he was a child negates these facts as corroborating evidence.
The record shows that the state never claimed that the shoes obtained from the defendant were the shoes worn by the perpetrator of Ms. White's murder. The evidence presented was that the shoes were similar in kind. The defendant's evidence of shoes purchased after the murder did not negate the corroborating aspect of the state's evidence. Indeed, one of the defendant's family members testified that the defendant always wore the same type of shoe.
As to the injuries on the defendant's hand, the conflict between the state's argument that the defendant sustained those injuries in his attack on Ms. White or whether the defendant sustained those injuries in his childhood was a credibility question for the jury. Moreover, the defendant was not arrested for Ms. White's murder for several months; any wounds obtained in the attack would most likely have healed. Whether the defendant's scar was a new or old injury, the fact remains that the defendant left his blood in eight separate locations in Ms. White's house. The defendant's arguments regarding the uncorroborated nature of the state's evidence are without merit.
Matters Regarding Counsel
Assignments of Error 2 and 3
The defendant raises two arguments, somewhat interrelated, which concern his trial counsel. The first argument involves the defendant's pre-trial assertion of a claim of ineffective assistance of counsel. The record shows that the defendant filed two pro se motions pre-trial, alleging that he was receiving ineffective assistance of counsel and seeking the appointment of new counsel.[8] Other than directing defense counsel and the defendant to better confer with each other, the trial judge undertook no further action with regard to these motions. In addressing the defendant at a pretrial hearing on another matter, the trial court stated the following:
Now, Mr. Draughn, I hope  and I'm not saying for you to respond to. I just want you to receive the information that the Court is giving you. I trust that what I've said thus far and what I say today will not only satisfy you in terms of understanding you have to work with your lawyers. You've got enough time you have time to work with your lawyers and I encourage you to do so. At the same time your lawyer, only one is here *598 and the other is not, you need to hear me say we're not going to be put in a position where the lawyers don't talk to their client until just before the proceedings.
So, Mr. Draughn, I'm saying this so you can't say that this Court was not listening to all of your previous concerns and you can't say that this Court did not try to make a record that your lawyers need to talk to you, but more importantly you need to talk to your lawyers. You've got time to do it and they've got time to visit with you. I'm hoping that you as well as your lawyers don't come to court in a month from now and say we haven't been communicating. Okay?[9]
The defendant responded, "Yes, sir, I understand." Id. Thereafter, defense counsel indicated that one of the defendant's counsel was scheduled to visit with the defendant the next afternoon. Id.
On appeal, the defendant claims that the trial court's failure to hold a hearing on these motions for new counsel requires that he receive a new trial or, in the alternative, requires a remand for a hearing so that the defendant may establish the facts underlying his complaints.
In a related argument, the defendant asserts the trial judge erred in failing to hold a hearing pre-trial on his counsel's rule seeking reimbursement of expenses and reasonable overhead for his representation of the defendant in this first degree murder trial. The defendant argues that the trial judge had notice that the defendant's right to effective assistance of counsel was being jeopardized in this additional regard as a result of his counsel's caseload and financial predicament. The defendant asserts these facts entitle him to a new trial, as well.
The record shows that on the first day of trial, appointed defense counsel filed a Rule to Show Cause Why Counsel Should Not Be Compensated For Work Performed.[10] In this motion, counsel explained that he had been appointed to represent the defendant on both the first degree murder charge presently set for trial, and on the unrelated second degree murder charge regarding Justin Bradley. Approximately a week prior to trial, appointed defense counsel submitted an invoice for services performed and was informed by the local indigent defender board that the funds set aside to compensate defense counsel for his representation of the defendant were exhausted.[11] Counsel alleged that requiring him to go to trial without compensation violated the pronouncement in State v. Wigley, 624 So.2d 425, 429 (La.1993) that "any assignment of counsel to defend an indigent defendant must provide for reimbursement to the assigned attorney of properly incurred and reasonable out-of-pocket expenses and overhead costs." Counsel sought a stay of the first degree murder trial until such time as the funding to reimburse him for his expenses and reasonable overhead costs could be secured.
The record further shows that the trial court set the rule to show cause for a date after the trial concluded.[12] The trial court stated that, after the trial, counsel would know with certainty what his expenses and overhead costs had been. The trial court stated it was of the opinion that there were *599 funds with which to pay appointed counsel. The record shows that after trial the rule was set.[13] The record of the minutes reflects that defense counsel later withdrew the rule to show cause.[14]
We find no grounds present in these facts which would entitle the defendant to relief. In neither argument does the defendant assert that his trial counsel was ineffective in any way. In fact, appellate counsel specifically denies that any allegation of ineffective assistance is urged. In brief, the defendant states: "Mr. Draughn is not here asserting a claim of ineffective assistance of counsel, but, rather, is challenging the trial court's failure to hold a hearing or otherwise address his pre-trial allegations."[15] In responding to the state's characterization of his claims as presenting ineffective assistance of counsel issues, appellate defense counsel reiterates this point in reply, stating:
Mr. Draughn in his Initial Brief never argued that this Court should reverse his conviction because trial counsel was ineffective or because trial counsel was given inadequate funds. Rather, Mr. Draughn argued that he is entitled to relief from this Court because the trial court failed to fulfill its duty of making an adequate inquiry into Mr. Draughn's pro se complaints against counsel, particularly considering that they were corroborated by counsel's complaints about his own funding and preparation.[16]
La.C.Cr.P. art. 921 provides that "a judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused." The defendant's claims, as stated, do not present this court with facts sufficient to find reversible error.
Assuming, without deciding, that the trial court's failure to hold a hearing on the defendant's pre-trial motions may have been error, this fact, without more, fails to present the court with anything from which to discern prejudice to the defendant without a corresponding claim that counsel rendered ineffective assistance at trial. At the most, the trial court's failure to hold a pre-trial hearing on the motions would constitute harmless error.
Similarly, the mere fact that the trial court in its discretion set appointed defense counsel's rule for funds after trial was concluded instead of before trial does not present this court with sufficient facts with which to discern prejudice to the defendant. There is nothing currently before the court which would lead us to conclude that appointed defense counsel was not paid for his representation of the defendant or that the lack of funding in the week period prior to trial had a detrimental effect on counsel's representation. In fact, the record affirmatively supports the conclusion that the defendant received constitutionally effective assistance at trial from appointed counsel, regardless of the defendant's pre-trial complaints. Appellate counsel's arguments, without more, do not present the court with any facts upon which the requested relief could be based.
Batson Objection
Assignments of Error 5 and 6
The defendant argues that the prosecutor improperly struck prospective jurors on the basis of their race. Specifically, the defendant claims the trial judge *600 failed to apply the proper standard under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in finding that no prima facie case of discrimination arose from the prosecutor's use of peremptory challenges to excuse prospective jurors Loshun Jackson, Lori Graham, Peggy Taylor and Wiley Shepherd. In the alternative, the defendant seeks a remand for a hearing on the matter at which time the prosecutor would have to state race neutral reasons for the challenge.
The proper reviewing process for a Batson claim was recently described by the Supreme Court as follows:
A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. 476 U.S., at 96-97, 106 S.Ct. 1712, 90 L.Ed.2d 69. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Id., at 97-98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. Although the prosecutor must present a comprehensible reason, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices. Purkett v. Elem, 514 U.S. 765, 767-768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. Batson, supra, at 98, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69; Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 2331-2332, 162 L.Ed.2d 196 (2005). This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Purkett, supra, at 768, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834.
Rice v. Collins, 546 U.S. 333, 126 S.Ct., 969, 974, 163 L.Ed.2d 824 (2006). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724; see State v. Dunn, XXXX-XXXX p. 7-8 (La.11/1/02), 831 So.2d 862, 869.
In this case, the voir dire record shows that the selection of jurors proceeded in the following manner. Prospective jurors were questioned in panels of six or ten to allow the attorneys to exercise cause challenges.[17] After all cause challenges were made, the first twelve prospective jurors remaining were called as a panel. The attorneys then indicated their peremptory challenges as to these prospective jurors simultaneously to the trial court, including any back strikes.[18] Whatever number had been peremptorily struck, that number of prospective jurors was added until there was again a panel of twelve prospective jurors. Peremptory challenges continued to be utilized until neither party requested *601 a peremptory challenge. Once twelve prospective jurors withstood peremptory challenge, the jury would be selected. Thereafter, the parties selected three alternate jurors in the same manner.[19]
The voir dire record shows that after six rounds of peremptory challenges, twelve prospective jurors had tentatively been selected as the jury.[20] At that time, the trial court instructed counsel to indicate whether they had any back strikes. Peremptory challenges were exercised against prospective jurors Nancy Elliott, Loshun Jackson, Lori Graham and Peggy Taylor.[21] Two more rounds of peremptory challenges were undertaken until twelve prospective jurors were tentatively selected.[22] The trial court again asked for any back strikes and more prospective jurors were released.[23] The trial court held three more peremptory challenge rounds until another twelve prospective jurors were tentatively selected and the trial court again asked for any back strikes.[24] At that time, the trial court announced there were no more back strikes and a jury had been selected.[25]
The first prospective juror considered as the first of three alternate jurors was peremptorily challenged by the defense.[26] The second prospective juror to be considered as an alternate, Wiley Shepherd, was peremptorily challenged by the state.[27]
At this point in the voir dire proceeding, defense counsel indicated to the court that he was going to enter a Batson challenge and ask that the state be required to show race neutral reasons for its striking of Wiley Shepherd, Lori Graham, Loshun Jackson and Peggy Taylor. According to the defense, the state had utilized four of its peremptory challenges against these prospective jurors and only two of its peremptory challenges against white prospective jurors.
The trial court informed the defense that "your facts are not accurate enough for the Court to consider that you have successfully presented a Batson motion."[28] Further discussion revealed that the state and the defense had each exercised a peremptory challenge against Nancy Elliott, a white female. Thus, the state had used four peremptory challenges against African-American prospective jurors and three peremptory challenges against white prospective jurors. Considering the state's use of peremptory challenges, the trial court was "not persuaded that you have established factually an allegation of Batson."[29]
The trial court asked the defense if it had further argument to present, but the defense declined to present anything further other than noting its objection to the ruling.[30] After asking the state if it wished to respond, the trial court interrupted the prosecutor as he was about to make a record of which prospective jurors the state had struck.[31] The trial court clarified his inquiry to the state as the *602 question whether, notwithstanding the court's determination that a Batson motion had not been properly presented, the state wished to respond to the motion. The state declined to present argument.[32]
The record shows that the trial judge determined that the defendant did not bear his burden of proving the first step of Batson, i.e., that a prima facie case of purposeful discrimination existed. Thus, the burden did not shift to the prosecution in the second step of the Batson analysis, requiring the state to provide a race-neutral explanation for the peremptory strike. Our inquiry, then, is whether the trial court erred in finding that the defendant failed to present a prima facie case of purposeful discrimination.
Subsequent to this 2003 trial, the Supreme Court further clarified its Batson analysis with regard to Batson's first step in Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), and its analysis of Batson's third and final step in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Our review of the defendant's claim is informed by the Supreme Court's pronouncements in Johnson and Miller-El.
Johnson reiterated that "a prima facie case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives `rise to an inference of discriminatory purpose.'" Johnson, 545 U.S. at 169, 125 S.Ct. 2410, citing Batson, 476 U.S. at 94, 106 S.Ct. at 1712. In Johnson, the Supreme Court quoted Batson's explanation of what constitutes a prima facie case:
[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Id., at 96, 106 S.Ct. 1712 (citations omitted) (quoting Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)). (Emphasis supplied).
Johnson, 545 U.S. at 169, 125 S.Ct. 2410.
The specific question in Johnson was whether Batson permitted the State of California to require at the first Batson step that the objector show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias.[33] In holding that the California "more likely than not" standard was an inappropriate indicator of the sufficiency of a prima facie case, the Supreme Court explained that the first step of Batson was not intended to require the defendant to present sufficient evidence to meet the third and final step's analysis:
Thus, in describing the burden-shifting framework, we assumed in Batson that the trial judge would have the benefit of all relevant circumstances, including the *603 prosecutor's explanation, before deciding whether it was more likely than not that the challenge was improperly motivated. We did not intend the first step to be so onerous that a defendant would have to persuade the judge-on the basis of all the facts, some of which are impossible for the defendant to know with certainty-that the challenge was more likely than not the product of purposeful discrimination.
Johnson, 545 U.S. at 170, 125 S.Ct. 2410. "Instead, a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Id.
On appeal, the defendant asserts that, as an African-American, he was a member of a cognizable racial group and that the prosecutor exercised peremptory challenges to remove from the venire four other members of the defendant's racial group. As recognized by Johnson, the defendant may rely on the fact that peremptory challenges, by reason of the fact that they may be subjectively based, constitute a jury selection practice which may allow those who intend to discriminate to do so. However, the defense failed to raise any other relevant evidence that would support an inference of discrimination.
Our review of the entire voir dire convinces us that the mere invocation of Batson when minority prospective jurors are peremptorily challenged in the trial of a minority defendant does not present sufficient evidence in this case to lead to an inference of purposeful discrimination. There is nothing in Batson, or indeed in Johnson, which would require such an automatic finding. Otherwise, there would be no need for the first Batson step in the trial of any defendant who was a member of a cognizable racial group whenever a peremptory challenge was raised to a prospective juror who was also a member of that racial group; the Supreme Court's holding in Johnson did not collapse the first step in the Batson analysis. We do not believe that Batson or Johnson can be read so broadly.
Johnson makes clear that the burden of production in the first Batson step is squarely on the defendant.[34] Without further argument or reasons presented by the defense under the circumstances of this case, the trial judge had nothing from which to draw an inference of purposeful discrimination. Instead, the trial court had several relevant circumstances which negated a finding of discriminatory intent on the part of the prosecution in exercising its peremptory challenge.
First, the nature of the case itself presented no overt racial overtones. Both the victim and the defendant were from the same cognizable racial group.[35]
Second, the trial court properly considered the timing of the defense objection. At the time the state entered its peremptory challenges to Lori Graham, Peggy Taylor and Loshun Jackson, the defense failed to raise a Batson objection. Several more panels were considered, and still no defense objection was raised. The jury was selected, and still no defense objection was made. Only after Wiley Shepherd was peremptorily challenged by the state as an alternate juror did the defense raise an objection. Although the objection was timely under our law in the sense that the *604 entire jury panel had not yet been sworn together,[36] this circumstance contrasts sharply with the situation in other cases where the defense attorney raises objection immediately after the prospective juror is challenged.[37]
Third, the trial judge could take into consideration the tenor of the voir dire questioning. The prosecution used the same questions throughout its voir dire. There is no indication that any particular prospective jurors were "targeted" for more questioning in an attempt to provoke a certain response. Indeed, there was an unprecedented amount of cooperation between the state and defense counsel. All but five of the cause challenges were submitted as joint requests by the prosecutor and defense counsel.[38]
Fourth, although the record itself does not designate the racial make-up of the prospective jurors, the Uniform Capital Sentence Report, which was completed by the trial judge pursuant to this court's rule,[39] shows that the jury which actually heard the defendant's case consisted of 11 white jurors and one black juror. "Although the mere presence of African American jurors does not necessarily defeat a Batson claim, the unanimity requirement of a capital case sentencing recommendation may be considered." State v. Tart, XXXX-XXXX p. 18 (La.2/9/96), 672 So.2d 116, 141, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). The trial judge was aware that the state had several unused peremptory challenges and did not utilize them to remove the minority juror. Unlike Johnson, all of the prospective African American jurors were not stricken from the pool of prospective jurors.[40]
Finally, the trial judge in Johnson thought the issue of the prosecutor's possible discriminatory intent "very close."[41] Here, the trial judge indicated clearly he found no discriminatory intent whatsoever.
In making our determination, we note that the prosecution's use of a peremptory challenge cannot be separated from the context in which the challenge arises, a context which the trial judge is in the best position to evaluate. This record shows that the trial judge, prosecutor and defense counsel were all actively engaged in a full and complete voir dire. An analysis of the voir dire as a whole convinces us that the trial judge was correct in his determination that no prima facie showing of purposeful racial discrimination was met by the defense in its Batson objection.
Although a trial judge does not make a determination of the credibility and persuasiveness of the prosecutor's stated race-neutral reasons until the third and final step of a Batson analysis, which was not reached in the case here, we nevertheless gain comfort in the appropriateness of our decision by our review of the type of *605 factors which would support the ultimate finding of purposeful discrimination denounced in Miller-El. The record in this case reveals no disparate questioning of any of the prospective jurors, as was found in Miller-El.[42] There were no "trick" questions from which prosecutors could manufacture race-neutral reasons for removing jurors.[43] There was no procedure by which juror placement on panels could be manipulated in order to reach non-minority prospective jurors before minority prospective jurors.[44] Nor was there any evidence of a historical practice of racial discrimination in the selection of juries in Caddo Parish, as was present in Miller-El.[45]
In Batson, as in Johnson, the prosecutor's actions and the other relevant circumstances in those cases were sufficient evidence from which the trial judge found a prima facie showing of discriminatory intent in the prosecutor's use of peremptory challenges. Consequently, the Supreme Court remanded the cases for consideration of the subsequently steps of the analysis described in Batson. No such remand is necessary here. Because the trial court found no discriminatory intent, a finding in which this court finds no error, it is unnecessary to proceed to either the second step of Batson, which requires the state to articulate race-neutral reasons for its peremptory challenges, or the third step of Batson, where the trial court scrutinizes the state's reasons to determine whether the state's challenges are impermissibly based on racial considerations. Further, because no discriminatory intent was shown or found, it is unnecessary for the court to determine whether the record itself demonstrates race-neutral reasons for the state's peremptory challenges.[46]
Based on the circumstances of this case, including our review of the totality of the voir dire, we do not find error in the trial judge's conclusion that the defendant failed to present a prima facie case of purposeful discrimination in the peremptory challenges of Lori Graham, Peggy Taylor, Loshun Jackson or Wiley Shepherd. The trial court properly found that sufficient evidence to support an inference of a prima facie showing of discriminatory intent was not produced by the defendant. No discriminatory intent on the part of the prosecutor was shown or found. Thus, no further inquiry is required and the subsequent steps of the Batson analysis need not be performed.
Other Crimes Evidence in Penalty Phase
Assignments of Error 7 and 8
The defendant complains about other crimes evidence introduced by the state during the penalty phase of trial. He asserts that evidence of the unadjudicated murder of Justin Bradley actually showed *606 by clear and convincing evidence that another person was responsible for that crime, and not him. He claims that the introduction of this evidence injected an arbitrary factor into his sentencing proceeding, making the jury's sentence unreliable. He also asserts the trial court erred in failing to conduct a hearing to determine whether other crimes evidence was admissible in the penalty phase until after the guilt phase had concluded.
La.C.Cr.P. art. 905.2(A) provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates." Because the character of the defendant is automatically at issue in the penalty phase of a capital trial, evidence of the defendant's prior convictions are admissible as bearing on that determination. State v. Comeaux, 1993-2729 p. 5 (La.7/1/97), 699 So.2d 16, 19-20, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998). Due process considerations require that the state give pretrial notice to the defense of the prosecutor's intention to introduce evidence at the penalty phase of other crimes committed by the defendant. Comeaux, 1993-2729 p. 5, 699 So.2d at 20, citing State v. Hamilton, 478 So.2d 123 (La.1985), cert. denied, 478 U.S. 1022, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986).
Unrelated criminal conduct of the defendant for which no conviction has been obtained may also be instructive as to the defendant's character. In State v. Jackson, 608 So.2d 949 (La.1992), this court held that the state may introduce evidence of unadjudicated and unrelated criminal conduct in the penalty phase of a capital trial once the trial judge has determined: "(1) the evidence of defendant's connection with commission of the unrelated crimes is clear and convincing, (2) the proffered evidence is otherwise competent and reliable, and (3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is [the] focus of the sentencing hearing under Article 905.2." Jackson, 608 So.2d at 955, citing State v. Brooks, 541 So.2d 801, 814 (La.1989). Jackson limited the criminal conduct for which the prosecutor may introduce evidence in the case-in-chief in the capital sentencing hearing to that which involves violence against the person of the victim and conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried. Id., 608 So.2d at 955. The hearing to determine whether other crimes evidence is admissible in the penalty phase is often called a "Jackson" hearing.
In Comeaux, we stated that the judge should make the determination of admissibility of unadjudicated other crimes evidence prior to trial or during the trial:
At the outset, it is important to note that the judge, and not the jury, determines the admissibility of the evidence of unrelated criminal conduct by determining whether the defendant's commission or connection with the commission of the criminal conduct was proved by clear and convincing evidence and whether the unrelated conduct has relevance and substantial probative value as to the defendant's character and propensities. The judge preferably should make this determination at a pretrial hearing, but certainly at a hearing outside the presence of a jury, whether before or during the trial.

Comeaux, 1993-2729 p. 8-9, 699 So.2d at 21 (emphasis supplied).

*607 Timing of Jackson Hearing

The record in this case shows that the state gave pretrial notice to the defense of its intention to introduce evidence of other crimes, both adjudicated and unadjudicated, at the penalty phase. In a pleading filed on March 11, 2003, the state gave notice that it intended to introduce evidence of: (1) the second degree murder of Justin Bradley, which occurred on or about August 21, 2000 and for which offense the defendant was currently indicted; (2) the aggravated battery of Willie Bush, which occurred on or about October 25, 1999; (3) the defendant's conviction for possession of cocaine on or about July 16, 1989; and (4) the defendant's conviction for possession of cocaine with intent to distribute on or about August 6, 1992.[47] The record also affirmatively reveals that the state provided to the state discovery relating to the second degree murder charge. Moreover, defense counsel appointed to represent the defendant on the first degree murder charge was also appointed to represent the defendant on the second degree murder charge.[48] Consequently, there is no doubt that the defense was provided with sufficient pre-trial notice of the unadjudicated second degree murder charge for which the state intended to present evidence at the penalty phase.
The defense's contention is not that there was lack of notice of this unadjudicated conduct, but rather, the defendant complains that the state did not move for a hearing pre-trial to determine whether this evidence was admissible. The record supports the defense's contention that the state did not request a pre-trial hearing on this matter. After the guilt phase was completed, and the necessity for a penalty phase arose, the prosecutor reminded the trial court that the state had a considerable amount of penalty phase evidence concerning the unadjudicated homicide, the unadjudicated aggravated battery and two prior convictions.[49] After hearing the argument of counsel, the trial judge ruled that the prosecution would not be allowed to conduct a Jackson hearing at that time. The trial judge denied the state's request on the ground that the hearing was not held prior to trial.[50]
From this ruling denying a determination of admissibility, the state took a writ to the court of appeal. The appellate court granted the state's writ and ordered the trial court to "conduct a hearing on the proffered evidence, rule on its admissibility, and promptly continue with the sentencing phase of the trial."[51] No further review was sought on this issue.
The appellate court ruling was correct under Comeaux. Although a pre-trial hearing may be the preferable mode, Comeaux makes clear that the Jackson hearing may be held during trial as well, as long as the hearing is outside the presence of the jury. Comeaux, 1993-2729 p. 9, 699 So.2d at 21. The defendant's argument here, that the defendant's trial was over because the guilt phase was completed, is unpersuasive. Clearly, a capital trial *608 encompasses both the guilt phase and penalty phase. As long as a defendant has adequate pre-trial notice of the state's intent to introduce other crimes evidence, a Jackson hearing may properly be held after the adjudication of guilt and prior to the penalty phase, outside the presence of the jury. See State v. Manning, XXXX-XXXX p. 50 (La.10/19/04), 885 So.2d 1044, 1091, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).

Evidence of Unadjudicated Second Degree Murder
The record shows that the Jackson hearing was held on the day following the appellate court's order. After hearing the evidence presented by the state on the unadjudicated charge of second degree murder, the trial court limited the state's evidence to the testimony of two law enforcement officers who investigated the case and obtained evidence from the crime scene, an eyewitness, and a DNA expert.[52]
In the penalty phase, the state presented the following evidence: Debra Clements testified that on August 21, 2000, she was driving her car with her boyfriend as a passenger. Her boyfriend was later identified as Antonio Washington. Ms. Clements and Mr. Washington stopped at Justin Bradley's house at 1808 Acorn Street in Shreveport, Louisiana. They asked Mr. Bradley if he wanted to go with them to the store down the street. When Mr. Bradley refused, they drove to the store and soon returned.
On their return, Ms. Clements remained in the car while Mr. Washington exited the car and knocked on the front door of Mr. Bradley's house. Ms. Clements was able to see a commotion taking place inside the house through the curtains and saw the front door open and then slam shut. Mr. Washington had not entered the house and was still standing at the door. Ms. Clements heard something drop inside the house and some words being spoken, although she could not discern what was being said.
Ms. Clements next heard a gunshot from within the house. Mr. Washington jumped off the porch and started running down the street. Ms. Clements heard another gunshot and saw a man she did not recognize come out of the front door of Mr. Bradley's house. Ms. Clements and the man looked at each other for several seconds, making eye contact, and then Ms. Clements quickly drove away.
Ms. Clements described the man as dark skinned and stocky. The man was wearing dark jeans and a black t-shirt and had a stocking cap on his head. She could see that he carried a gun at his side. Because the man was holding the gun toward his back, she was unable to determine what kind of weapon it was.
As she drove away, Ms. Clements called 911. She drove down the street and picked up Mr. Washington, who was about a block away. They stopped at a friend's house to see if anyone had heard the gun shots, then drove back to Mr. Bradley's house.
While Ms. Clements continued to talk to the 911 operator, Mr. Washington and another person entered Mr. Bradley's house. When the police arrived, Ms. Clements told them what she had seen and described the man she had seen walk out of Mr. Bradley's house after the gun shots. At the police station, Ms. Clements was shown a photographic lineup and identified the defendant as the person she saw walking out of Mr. Bradley's house.
*609 Ms. Clements, who appeared in jail attire for her testimony, admitted that she was serving a three year sentence as a principal to two counts of carjacking. Her co-defendant on those charges was her boyfriend, Antonio Washington. She also admitted to a prior forgery conviction in 1992. She told the jury she had not been promised, nor did she receive, any leniency in connection with those convictions in exchange for her testimony.
On cross-examination, Ms. Clements admitted that she had a pistol in her car but that the gun stayed in the car and was not removed by her or Mr. Washington. She told the officers at the scene about the gun in her car when they asked to search her car. The gun was later confiscated by the police. She admitted that it was getting dark when she observed the man leave Mr. Bradley's house, but that there was sufficient light outside to identify him.
Ms. Clements told the jury she walked into the house to check on Mr. Bradley's condition while speaking to the 911 operator, but left immediately after she saw the wound in the back of his head. She then sat in her car to await the police. Ms. Clements stated that she saw marijuana in the house on a couch and that Mr. Washington stayed inside the house when she walked outside. Because she was talking to the 911 operator, she did not notice what her boyfriend was doing while she waited for the police to arrive. Her car was later confiscated by the police when they found Mr. Bradley's boots with blood on them in the trunk, along with some marijuana and a pill bottle.
Ms. Clements believed that Mr. Bradley was wearing khaki-colored pants and shoes when she saw him lying on his floor. She told the jury that no clothing or shoes were taken from her that night for testing nor was she arrested on any charges. To her knowledge, Mr. Washington was not arrested on any charge that night and none of his clothing was taken for testing. She admitted that no tests of any sort were run on her or her clothing.
On redirect examination, Ms. Clements stated that she had consented to the police search of her car.
Corporal Van Zandt of the crime scene investigations unit of the Shreveport Police Department took pictures of Mr. Bradley's house in the course of his investigation. The photographs show a cordless telephone lying on the floor of Mr. Bradley's residence just inside the door. They also show Mr. Bradley's body lying on the floor in a pool of blood. The victim was wearing long jean shorts at the time he was murdered. Other photographs show the gun shots to the victim's right wrist and to the back of his head. Shot gun shells were found in the house in various locations. Marijuana was found in the victim's house packaged in a plastic bag.
Corporal Van Zandt saw that Mr. Bradley was barefoot as he investigated the scene, and that Mr. Bradley's feet were clean even though the floors of the house were dirty. Although no shoes were found inside of the house, investigating officers subsequently located a pair of boots in the trunk of Ms. Clements' vehicle. Corporal Van Zandt photographed the boots in the trunk, as well as money and marijuana. The packaging of the marijuana found in the victim's house and in the trunk of Ms. Clements' car appeared to be the same.
Detective Jeter was employed with the Shreveport Police Department in the violent crimes division at the time of Mr. Bradley's murder.[53] Detective Jeter was *610 the lead detective on the homicide and initially spoke with Ms. Clements at the crime scene. Ms. Clements told the detective that she and her boyfriend had come to the victim's house to pick up something that belonged to someone else. She told the detective she had heard arguing coming from inside the residence and then two gunshots. She described the man she had seen leaving Mr. Bradley's house after she heard the gunshots as being approximately 6 foot tall, 220 pounds and carrying a long gun.
At the police station, Detective Jeter showed to Ms. Clemens a photographic lineup which contained a picture of the defendant. Ms. Clements immediately picked the defendant's photograph as the individual she saw leaving Mr. Bradley's house after she heard two gun shots. Detective Jeter then requested an arrest warrant for the defendant. The police looked for the defendant at several residences and places that he frequented pursuant to the warrant but were unable to find him. The defendant turned himself in to the police the next day.
The detective attended the autopsy of Mr. Bradley. Photographs taken during the autopsy were admitted in evidence and shown to the jury. The photographs showed the various wounds received by Mr. Bradley. Detective Jeter made an in-court identification of the defendant as the man he arrested for the homicide of Justin Bradley.
Detective Jeter also testified on cross-examination that Ms. Clements told him at the scene that her boyfriend had picked up something from inside Mr. Bradley's house, although she did not know what he had taken. She later admitted to the detective that Mr. Washington had taken Mr. Bradley's shoes.
Detective Jeter was also struck by the fact that Mr. Bradley's feet were clean even though he wore no shoes, considering that the floors of the house were dirty. Mr. Bradley's shoes were later found in Ms. Clements' trunk, along with a $10 bill and a cellophane baggy containing 88 grams of marijuana having a street value of $880.
After this discovery, Ms. Clements' car was seized and transported to the police department's impound lot. Detective Jeter stated that the marijuana seized inside Mr. Bradley's house was similar in size to the marijuana seized from Ms. Clements' trunk. No shoes or clothing were ever seized from Ms. Clements or Mr. Washington. No tests for gunshot residue were performed on the defendant's hands after he was arrested.
Connie Brown, a DNA expert, testified that blood found on the defendant's shoe was consistent with that of Mr. Bradley. The statistical probability of the blood on the defendant's shoe belonging to another African-American male other than Mr. Bradley was 1 in 7.4 quadrillion. Ms. Brown stated she did not know at what time Mr. Bradley's blood was conveyed to the defendant's shoe. Ms. Brown also stated that the blood on the boots found in Ms. Clements' car was determined to be Mr. Bradley's in the same statistical proportion.[54]
The defendant argues that the evidence presented with regard to the Bradley homicide actually established that Antonio Washington was more likely to have been responsible for the murder than he was. *611 Consequently, he asserts that the state could not have met the clear and convincing evidence standard required for unadjudicated crimes evidence in the penalty phase. The defendant asserts that Mr. Washington had a motive to kill Mr. Bradley, in that he wanted to steal the victim's marijuana; that Mr. Washington possessed Mr. Bradley's boots covered in Mr. Bradley's blood; that both Mr. Washington and his girlfriend, Ms. Clements, initially lied to police at the scene by stating they had not taken anything from inside Mr. Bradley's house; that Ms. Clements had a motive to lie at the hearing to protect her boyfriend; and that Mr. Washington had the opportunity to kill Mr. Bradley. However, the jury was aware of all of these facts, having heard them from the witnesses and in defense counsel's closing argument. The conclusions which the defense argues here require credibility determinations that were solely within the province of the jury to make.
Given the evidence presented to the jury, we find the state offered clear and convincing evidence that the defendant was responsible for the murder of Justin Bradley. Ms. Clements identified the defendant as the man leaving Mr. Bradley's house immediately after hearing two gunshots, and the defendant was arrested in the possession of shoes with Mr. Bradley's blood on them. While Mr. Washington and Ms. Clements' actions were reprehensible in that they likely robbed Mr. Bradley of his shoes, money, and drugs after his death, the evidence presented did not inculpate them in Mr. Bradley's murder. At most, the defense merely established that Mr. Washington and Ms. Clements robbed Mr. Bradley after the defendant murdered him.[55]

No Arbitrary Factor Introduced
The defense argues that an arbitrary factor was injected into the jury's sentencing decision because, as argued by the defense, the evidence of the defendant's responsibility for the murder of Justin Bradley was too tenuous to be probative of the defendant's character and propensities. We find that the defendant's commission of this second unrelated murder was highly relevant to the jury's *612 task of considering the defendant's character and propensities in determining the appropriate sentence. This court has previously noted that "crimes of violence against the person indicate moral qualities and character traits pertinent to the propensity to commit first degree murder. . . ." Jackson, 608 So.2d at 955. "The propensity to commit first degree murder is significant" in the jury's function of "identifying the worst murderers for consideration of capital punishment." Jackson, 608 So.2d at 955 n. 9. We disagree with the defense assumption that clear and convincing evidence was not presented to the jury of the defendant's commission of the Bradley homicide. Instead, we find the evidence of the defendant's commission of the Bradley homicide to be clear and convincing and highly relevant to the jury's determination of the appropriate sentence.
Prosecutorial Misconduct
Assignments of Error 9-11
The defendant argues that prosecutorial misconduct which occurred during trial violated his right to due process and undermined the reliability of the jury's death sentence. Specifically, the defendant claims the trial court erred in failing to grant the defense's motion for mistrial, or to admonish the jury, when the prosecutor misled the jury during guilt phase closing argument to believe there was blood on Ms. White's wallet and purse.
The record shows that in guilt phase closing argument the defense suggested that the lack of blood on the victim's wallet and purse, and the fact that photographs and not the items themselves were brought into court, undermined the state's argument that the murder had been committed during an armed robbery. The defense argued:
The items that we saw in there, the purse, the wallet, the billfold, now you noticed one thing, and keep this in mind throughout: You didn't see those brought into this courtroom and introduced to you in evidence so that you could look at them yourself. Now, here is a man the state is claiming is dropping blood all around the house, but he takes  presumably he takes time to go through this purse, look at the billfold, the checkbook and search for something of value. You didn't hear a single word about a drop of blood in the purse, on the wallet, on the checkbook, on that reflection of light that disappeared. There's no indication of anything. Wasn't even sent to the crime lab to be checked.[56]
On rebuttal, the prosecutor stated, "Now let's go into this DNA testing and let's go into the facts why these physical items weren't brought. I think it's obvious. I don't think I even have to explain it. They've got blood on them. That's why we introduce photographs. There was no ."[57] At that point, defense counsel asked to approach the bench and a conference was held off the record.
When the prosecutor resumed his argument, he told the jury, "We know that the robe and the rug and the curtains and the swatches had blood on them. Whether or not the purse or wallet did, I don't know. But those items are not brought into court for that purpose. We know that those ."[58] Defense counsel again objected and the jury was removed from the courtroom.
*613 Outside the presence of the jury, defense counsel argued that the prosecutor's first statement was a knowing misstatement of the evidence by the state. The defense requested a mistrial under La. C.Cr.P. art. 771 or, at a minimum, an admonishment to the jury by the court.[59] The trial court noted that, at sidebar, the prosecutor had admitted that there was no blood on the wallet or the checkbook. The trial court denied the motion for mistrial but held open whether he would admonish the jury, allowing the prosecutor an opportunity to "fix it."[60]
When the jury was returned, the prosecutor resumed his argument, as follows:
Ladies and gentlemen, as we were going over before the break concerning the introduction of the purse, the wallet and the contents, we don't know if there was blood on those items, because as you heard, the crime lab did not test them and we don't know the existence of any. And therefore, I submit to you not to look at that in any form or fashion to indicate that there was blood on those particular items. However [61]
The jury was again removed from the courtroom following defense counsel's objection.
Outside the presence of the jury, defense counsel claimed that the prosecutor was knowingly misstating the facts by claiming that "we don't know if there was blood on those items," when defense counsel argued the state's own witness admitted on cross that there were no fingerprints or blood on them.[62] The prosecutor responded that he did not know whether there was blood on the evidence, as they were not tested by the lab.[63]
After the trial court clarified that, based on the court's understanding of all the evidence, there was no blood found on the items, the trial court advised the prosecutor that he should not have stated that they did, ordered the prosecutor to tell the jury that the items did not have blood on them, and ordered the prosecutor to tell the jurors he was wrong in stating that the reason the prosecutor did not bring the items to court was because they had blood on them. The trial court told the prosecutor that if he did not do as ordered, he would be held in contempt and the court would deliver an admonishment to the jury as requested by defense counsel.[64]
When the jury was once again returned to the courtroom, the prosecutor stated:
Ladies and gentlemen, let me correct a statement that I made earlier as to why the checkbook and the wallet were not brought in was because they had blood on them. They don't have blood on them, and let me correct the statement at this time. May I proceed with argument, your Honor?[65]
The prosecutor then resumed his argument.
On appeal, the defense contends that the prosecutor's repeated suggestion that the *614 wallet and other items had blood on them required an admonition and then a mistrial. The failure of the trial court to grant a mistrial, or at least an admonition, the defense argues, was error requiring the granting of a new trial.
La.C.Cr. P. art. 774 limits the scope of counsel's argument to evidence, the lack of evidence, and conclusions that may be drawn therefrom. La.C.Cr.P. art. 771 provides authority for a judge to issue an admonishment to the jury upon the request of counsel, when a remark is made which is immaterial or irrelevant, or of such a nature that it might create prejudice against the defendant or the state but does not rise to the level of a statement requiring a mandatory mistrial.[66] Art. 771 further provides that, "upon motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial."
Mistrial is a drastic remedy, and the determination of whether prejudice to the defendant has resulted from the prosecutor's comments lies in the sound discretion of the trial judge. State v. Leonard, XXXX-XXXX p. 11 (La.6/16/06), 932 So.2d 660, 667. Moreover, a trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981). Although prosecutors are allowed wide latitude in choosing closing argument tactics, they should not misstate the evidence. However, even if the prosecutor exceeds the bounds of closing argument, this court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict. State v. Martin, 1993-285 p. 18 (La.10/17/94), 645 So.2d 190, 200, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995).
The defense argues here that the "judge left the jurors to speculate that there must be some truth in what the prosecutor was suggesting, and the defense was simply attempting to conceal that truth."[67] To the contrary, we find that the trial court's instruction to the prosecutor, and the prosecutor's subsequent admission to the jury, left the jury in no doubt about the fact that no blood was found on the purse or wallet and that the prosecutor had erred previously in stating or implying that blood was there.
We find that the defendant's argument ignores the clarity of the trial court's order to the prosecutor and the prosecutor's final admission to the jury. The trial court was not required to admonish the jury where the court did not find any prejudice to the defense in the prosecutor's statement.[68] Moreover, even if the prosecutor's statement was improper, the trial court did not need to admonish the jury when the trial court already required the state to do so. In addition, the trial court properly instructed the jurors prior to their deliberation that the attorneys' arguments were *615 not to be considered as evidence.[69] After reviewing the record transcript, we agree with the trial court's assessment that the defense suffered no prejudice from the prosecutor's statement. Consequently, we find no abuse in the trial court's discretion in refusing to grant a mistrial or to personally admonish the jury, as requested by the defense.
The defendant raises a second claim of prosecutorial misconduct with regard to the prosecutor's repeated references during voir dire, guilt phase, and penalty phase to the proximity of the victim's 65th birthday at the time she was murdered. The defense argues that the state was implicitly urging the jury to rely on an improper aggravating circumstance, since one statutory aggravating circumstance upon which the death penalty may rest is that the "victim was . . . sixty-five years of age or older."[70] The defense argues this circumstance improperly injected an arbitrary factor into the jury's sentencing determination.
Evidence established that the victim was just a few days away from her 65th birthday when she was murdered; in fact, the victim was buried on what would have been her birthday. We find that the prosecutor's adducing of these facts, or comments upon them, had more to do with the poignancy of the murder of the victim, rather than a calculated attempt to lure the jurors into consideration of an improper statutory aggravating circumstance. We find no due process violation which would prejudice the defendant nor do we find that an arbitrary factor was injected into the jurors' sentencing determination.
The jurors had previously been instructed that the arguments of counsel were not evidence.[71] The trial court instructed the jury prior to its sentencing deliberation that the only statutory aggravating circumstances upon which the state relied were (1) that the defendant was engaged in the preparation {sic} or attempted perpetration of armed robbery, first degree robbery, or simple robbery, and (2) that the offense was committed in an especially horrendous, atrocious or cruel manner.[72] Moreover, the jurors were given a list of the statutory aggravating circumstances upon which the state relied for their deliberation. Only the two, proper, statutory aggravating circumstances were provided to the jurors in their deliberations.[73]
Confrontation rights issues
Assignments of Error 12 and 13
The defendant contends that the trial court violated his right to confront the witnesses against him when the trial court curtailed the defense's cross-examination of two witnesses. The right to confront witnesses is ensured in both the federal and state constitutions. The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." La. Const. art. 1, § 16 guarantees each accused the right "to confront and cross-examine the witnesses against him."
This court has held that "[c]onfrontation means more than being allowed to confront the witnesses physically. `The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" State *616 v. Robinson, XXXX-XXXX p. 6 (La.5/17/02), 817 So.2d 1131, 1135, citing Davis v. Alaska, 415 U.S. 308, 315-316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (internal citation omitted). Cross-examination has been termed "the principal means by which believability and truthfulness of testimony are tested." Robinson, XXXX-XXXX p. 6, 817 So.2d at 1135.
Under the code of evidence, "a witness may be cross-examined on any matter relevant to any issue in the case, including credibility." La. C.E. art. 611(B). The trial court is empowered to exercise reasonable control over the manner of cross-examination so as to (1) ensure the effectiveness of the interrogation as a mode of ascertaining the truth; (2) avoid the needless consumption of time; and (3) protect witnesses from harassment or undue embarrassment. La. C.E. art. 611(A). "Subject to the discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, or discredit, the witness." Robinson, XXXX-XXXX p. 6, 817 So.2d at 1135. The ruling of the trial court as to the scope and extent of cross-examination should not be disturbed absent an abuse of the court's broad discretion. State v. Irish, 2000-2086 p. 7 (La.1/15/02), 807 So.2d 208, 213, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002); State v. Frost, XXXX-XXXX p. 32 (La.12/1/98), 727 So.2d 417, 439, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).
The defense first complains that the trial court limited his cross-examination of Sgt. Bickham, one of the crime scene investigators, during the guilt phase of the trial. Sgt. Bickham took a videotape of the crime scene and, during direct examination by the state, explained the way the victim's house looked on the morning that the victim's body was discovered, prior to the police investigation.
On cross-examination, defense counsel also used the videotape to question whether there was a white piece of paper visible on the victim's checkbook which was not captured in the still photographs or in other instances on the videotape when the same items were shown. The defense questioned Sgt. Bickham as to whether the officers moved evidence at the crime scene. Sgt. Bickham testified on cross-examination that, to his knowledge, nothing had been moved and agreed with defense counsel that the videotape at one point showed what appeared to be a white piece of paper on top of the checkbook lying on the victim's floor.[74]
On redirect examination, the prosecutor asked about the light sources for the videotape and the reflective nature of the items at issue. The prosecutor asked Sgt. Bickham whether what appeared to be a white piece of paper was, in actuality, a reflection of light off of the plastic checkbook. Sgt. Bickham stated it was possible that what appeared to be a piece of paper could have been a reflection of light.[75]
On re-cross, the defense again returned to the issue, obtaining from Sgt. Bickham his admission that he had initially agreed that what was seen in the videotape was a piece of paper. The defense was allowed to expound on the various angles present in the videotape and the reflective qualities of other items which could be observed. Finally, Sgt. Bickham stated that his training *617 had not equipped him to testify as to the light densities of various objects.[76]
After a state objection and a bench conference, the defense again returned to this subject, asking Sgt. Bickham about various light angles. Sgt. Bickham again admitted he had no scientific training to be able to definitively state that what was viewed in the videotape was a reflection.[77] The defense continued to ask questions about light angles and shadows, prompting another state objection.[78] During a recess called by the trial court, the trial court informed defense counsel that "we need to move on and get through with this case. That's the bottom line; okay?"[79] After some further discussion between defense counsel and the trial court,[80] the defense resumed re-cross examination of Sgt. Bickham with this exchange:
Defense counsel: Sergeant, you've had a few minutes now. Do you still believe that that's a reflection you saw on that billfold, on the checkbook.
Sgt. Bickham: I couldn't say conclusively based on my training whether it was not a reflection. I could not say that it was a reflection.[81]
We find no abuse of the trial court's broad discretion in instructing defense counsel to "move along" with his examination. The issue of whether there was an object which had been moved at the crime scene, and thus whether the investigating officers maintained the integrity of the crime scene, was fully explored on cross-examination, re-direct examination and re-cross examination. The issue was completely fleshed out for the jury's determination. Although trial defense counsel protested the trial court's ruling regarding the manner of his presentation, defense counsel does not suggest what further information the defense could have gleaned from Sgt. Bickham or how the defense was prejudiced by the trial court's ruling.
The defendant also complains that defense trial counsel was curtailed in his cross-examination of Debra Clements during the penalty phase. Ms. Clements, as stated supra, testified as an eyewitness regarding the murder of Justin Bradley. The exchange to which the defense objects proceeded as follows:
Defense counsel: Now was any item of clothing taken from you to check to test it and see if you had blood from the victim on your clothing?
Clements: No.

*618 Defense counsel: Were your shoes taken to see if you had any blood on your shoes?
Clements: No.
Defense counsel: Were you arrested for being a felony in possession of a firearm?
Clements: No.
[State objection; off-the record discussion]
Defense counsel: Were you arrested for anything that night?
Clements: No.
Defense counsel: Was your passenger [Antonio Washington] arrested for anything that night?
Clements: No.
Defense counsel: To your knowledge was any item of clothing ever taken from him for testing?
Clements: Not that I know of.
Defense counsel: Did anyone ever test your hands to see if you had fired a weapon?
Court: Counsel, approach.
[Off-the-record discussion]
Defense counsel: Ms. Clements, were any tests of any sort by any person run on you or your clothing?
Clements: No.[82]
Defense questioning continued after that, with defense counsel asking Ms. Clements questions about other subject matters. At the close of the state's presentation at penalty phase, defense counsel placed his objection on the record. Defense counsel objected to the court's instruction to move on with his questioning, the court having felt that the defense had exhausted non-repetitive questions with regard to certain points he was trying to make. Defense counsel was not able to state what information he otherwise would have tried to obtain in further questioning. Once again, the record shows defense counsel complained about the trial court's circumscription of the manner of his presentation, not its content.[83]
*619 Our review of the record shows no abuse of the trial court's broad discretion in this instance. The defense was making the point that no forensic tests were performed on Ms. Clements and her passenger that evening. Detective Jeter had testified to the same point. The questioning would have become repetitive and unnecessary to delve into each and every type of test that could have been performed after Ms. Clements acknowledged that no testing was performed. Similarly, once Ms. Clements acknowledged that no clothing was taken from her that evening, the questioning would have become repetitive to detail each possible type of clothing which was not taken. The defense was permitted to delve fully into the possibility that Ms. Clements and her passenger, Antonio Washington, were responsible for the death of Justin Bradley and to establish that they were not treated as suspects themselves by the police. Our review of the record shows that the trial judge in this case was actively engaged in keeping a tight rein on both the prosecution and the defense to ensure that questioning did not stray into irrelevant matters or to unnecessarily consume trial time.[84]
*620 Hearsay issue
Assignment of Error 14
The defendant contends that the trial court erred in allowing the admission of hearsay during the guilt phase of his trial. First, the defendant contends that the court erred in allowing the admission of the statement of an anonymous 911 caller who claimed to have heard that the defendant was involved in Ms. White's murder. Second, the defendant claims the court erred in allowing the coroner to testify about an autopsy performed by a deputy coroner.
During the testimony of Thomas McCarthy, a former homicide investigator,[85] Mr. McCarthy described how the investigation of Ms. White's murder was at a stand-still for six months. The testing of the nineteen voluntary DNA submissions from the friends and neighbors of Ms. White revealed no clue as to her murderer. In October, a little over six months after Ms. White's body was discovered, Mr. McCarthy received an anonymous tip from a concerned citizen that the person had heard in the neighborhood that the defendant was responsible for Ms. White's murder. The defense raised no objection to this testimony.[86]
During the testimony of Dr. McCormick, the coroner for Caddo Parish, Dr. McCormick acknowledged that he did not personally perform the autopsy of Ms. White's body. Instead, the autopsy of Ms. White's body was performed by the chief deputy coroner, who was no longer with the Caddo Parish Coroner's Office. The defense raised no objection to the introduction of the autopsy report or to the coroner's testimony *621 concerning the findings of the report.[87]
The failure of the defense to contemporaneously object to this testimony waives our review of the issue on appeal. See La. C.Cr.P. art. 841;[88]State v. Wessinger, 98-1234 p. 16 (La.5/28/99), 736 So.2d 162, 178, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999).
Sequestration issue
Assignment of Error 15
The defendant asserts the state violated the court's order of sequestration of witnesses. The defendant claims that the crime scene investigators[89] were all present when the prosecutor set up its video and photographic presentation during a lunch recess between court sessions. The defense claims that this violation was a serious one in that the integrity of the crime scene, and the officers actions at the crime scene, were issues in the case. The record shows that the defense requested the sequestration of witnesses.[90]
La. C.E. art. 615(A) provides:
On its own motion the court may, and on request of a party the court shall, order that the witnesses be excluded from the courtroom or from a place where they can see or hear the proceedings, and refrain from discussing the facts of the case with anyone other than counsel in the case.
The purpose of the sequestration article is to prevent witnesses from being influenced by the testimony of earlier witnesses. State v. Chester, 1997-2790 p. 8 (La.12/1/98), 724 So.2d 1276, 1282, cert. denied, 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999). The trial judge, in his discretion, may determine the disqualification of a witness when a rule of sequestration has been violated. State v. Stewart, 387 So.2d 1103, 1107 (La.1980). This ruling will not be disturbed absent an abuse of the trial court's discretion. Id.
Apparently, the defense believed the three crime scene investigators were present in the courtroom in the company of the prosecutor while the prosecutor set up the photo and video presentation that was to accompany the officers' testimony. Rather than raising an objection to a violation of the sequestration order, defense counsel chose to question the witnesses about their alleged communications during cross-examination. Arguably, as a result of failing to raise a contemporaneous objection, defendant has waived this claim on appeal. La.C.Cr.P. art. 841; Wessinger, XXXX-XXXX p. 16, 736 So.2d at 178.
There is no evidence that the rule of sequestration was ever violated, as there is no evidence that these witnesses discussed the case amongst themselves. Corporal Duddy could not remember whether he was with one or two other officers setting up the video equipment, nor could he remember what they discussed other than that they did not address the instant case.[91] Sgt. Bickham testified that he did not assist in setting up the video equipment *622 in the courtroom and denied being there with other officers and the prosecutor.[92] Mr. McCarthy testified that he and the prosecutor spoke in general about "how things were going since I left the [Shreveport] police department."[93] He thought that Corporal Duddy may have been there, but could not remember Sgt. Bickham being in the courtroom. He denied that there was any discussion of the case.[94]
Moreover, it is clear that the testimony of these three witnesses were not improperly influenced. There continue to be discrepancies in the officers' testimonies, unimportant to the resolution of this case. For instance, although all the officers acknowledged that the items in Ms. White's house were moved in furtherance of their investigation, they do not agree as to who initially moved those items. The allegations of the defense that the state witnesses discussed the case amongst themselves are belied by the testimony of the officers. Because there is nothing to support the speculative allegations of the defendant, we find no basis to remand the matter for a hearing as requested by the defense.
Jury instructions
Assignments of Error 16, 18-21
The defendant complains that improper jury instructions were given in both the guilt and penalty phases of his trial. Specifically, prior to guilt phase deliberations, the defendant asserts that the jury was not properly instructed as to reasonable doubt and was not instructed as to the definition of an "attempt." The defendant asserts that, prior to penalty phase deliberations, the jury was not provided with a narrowing instruction on the aggravating circumstance of "especially heinous, atrocious or cruel," was provided with an improper instruction as to commutation, and was improperly instructed as to their consideration of mitigating circumstances. The record shows that defense counsel affirmed on the record, outside of the jury's presence, that he had no objection to the guilt phase jury instructions[95] or the penalty phase jury instructions.[96] The failure of the defense to contemporaneously object to the jury instructions waives review of these issues on appeal. La. C.Cr.P. art. 801(C);[97] La. C.Cr.P. art. 841; Wessinger, XXXX-XXXX p. 20, 736 So.2d at 181.
Prosecutor's Statements
Assignment of Error 17
The defendant contends that the prosecutor's statements during voir dire concerning mitigating circumstances denied him his rights to due process and to a reliable and proportionate sentencing decision. Specifically, the defendant complains that the prosecutor's statements concerning how the jury should consider mitigating circumstances implied that the jury had discretion about which enumerated circumstances to treat as mitigating despite the plain language of La.C.Cr. P. art. *623 905.5. The defense argues that this, along with the alleged error in penalty phase jury instructions, entitles the defendant to a new sentencing hearing.
The record shows that there was no defense objection to any of the prosecutor's voir dire statements of which the defense now complains.[98] The failure of the defense to contemporaneously object to the prosecutor's statements during voir dire waives review of this issue on appeal. La.C.Cr.P. art. 841; Wessinger, XXXX-XXXX p. 20, 736 So.2d at 181.
Invalid Aggravating Circumstance
Assignment of Error 22
The defendant argues that the disjunctive wording of the verdict form prevents the determination whether the jury's verdict was unanimous or rests on a proper or improper basis. Specifically, the defense claims that the verdict form is not specific as to which grade of robbery it found to be an aggravating factor. Consequently, the defense argues, this aggravating circumstance should be invalidated.
The record shows that the jury unanimously found to exist the aggravating circumstance that the murder was committed while "the defendant was engaged in the perpetration or attempted perpetration of armed robbery, first degree robbery or simple robbery."[99] The record also shows that defense counsel did not object to the form of the jury's verdict. Thus, the claim is waived on appeal. La.C.Cr.P. art. 841; Wessinger, XXXX-XXXX p. 20, 736 So.2d at 181.
Short form indictment
Assignment of Error 23
The defendant claims that the short-form indictment was constitutionally deficient because it did not list the aggravating factors necessary to a first degree murder or the aggravating circumstances necessary to impose a death sentence.
The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Gainey, 376 So.2d 1240, 1243 (La.1979). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. State v. Williams, 480 So.2d 721, 722, n. 1 (La.1985); La.C.Cr.P. art. 465, Official Revision Comment (a). Given counsel's failure to file a motion to quash, the defendant arguably waived any claim based on the allegedly defective indictment.
Notwithstanding the procedural bar to the claim, the Louisiana Constitution of 1974 provides that an accused shall be informed of the nature and cause of the accusation against him. La. Const. Art. I, § 13. That requirement is implemented by La.C.Cr.P. art. 464, which provides:
The indictment shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall state for each count the official or customary citation of the statute which the defendant is alleged to have violated. Error in the citation or its omission shall not be ground for dismissal of the indictment or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.
*624 La.C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder. The constitutionality of short forms has been consistently upheld by this Court. State v. Baylis, 388 So.2d 713, 718-19 (La.1980); State v. Liner, 373 So.2d 121, 122 (La.1979). When those forms are used, it is intended that a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. Baylis, 388 So.2d at 719; State v. Johnson, 365 So.2d 1267, 1270-71 (La.1978); La.C.Cr.P. art. 465, Official Revision Comment (a).
In the instant case, the defendant was aware of the nature of the charges against him. The state charged him by a bill of indictment, which read
On this the 12th day of December, 2000, the Grand Jury of the Parish of Caddo, State of Louisiana, charges that on or about the 9th day of April, 2000, at and in the Parish, District and State aforesaid, DARRELL D. DRAUGHN committed the offense of FIRST DEGREE MURDER as defined by R.S. 14:30 in that he COMMITTED FIRST DEGREE MURDER OF LORETTA WHITE, contrary to the law of the State of Louisiana and against the peace and dignity of the same."[100]
Accordingly, the defendant was charged in compliance with La.C.Cr.P. art. 465(A)(31), which provides as a short form indictment for first degree murder: "A.B. committed first degree murder of C.D." See Manning, XXXX-XXXX p. 49, 885 So.2d at 1090.
Penalty Phase Verdict Form
Assignment of Error 24
The defendant asserts that the penalty phase verdict form is unconstitutional as it does not require the state to prove that death is an appropriate punishment beyond a reasonable doubt and places the burden of proving mitigation on a defendant. Specifically, the defendant claims that although the verdict forms used in this case conformed to the statutory requirements of La.C.Cr.P. art. 905.7, the form offends constitutional principles by limiting the jury's consideration of mitigation to that "offered" by the defense. The defendant complains that the jury may have disregarded relevant mitigating evidence solely because it was not specifically introduced or argued by the defense.
The defense waived consideration of this issue on appeal by its failure to contemporaneously object to the verdict form. La. C.Cr.P. art. 841; Wessinger, XXXX-XXXX p. 20, 736 So.2d at 181. Moreover, this court has previously rejected this identical argument. See Manning, XXXX-XXXX p. 72, 885 So.2d at 1106.
Deficiencies in appellate record
Assignment of Error 25
The defendant contends that a lack of a complete record requires reversal of his conviction and sentence. Specifically, the defendant claims that he has been denied effective assistance of appellate counsel because the present appellate record lacks: (1) transcripts of numerous bench conferences; (2) a transcript of the defendant's arraignment; (3) hearing transcripts involving defense counsel and conflicts of interest; (4) transcripts of proceedings which may have occurred but were not otherwise reflected in the minutes; (5) a handout given to potential jurors enumerating all of the aggravating factors of La. R.S. 14:30(A), including *625 those inapplicable to this case; (6) the jury's guilt phase verdict form; (7) transcripts for hearings at which the defendant alleged ineffective assistance of counsel; (8) post-trial hearing transcripts; and (9) transcripts of the testimony of several witnesses.
La. Const. art. 1, § 19 guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." Additionally, La.C.Cr.P. art. 843 provides:
In felony cases . . . the clerk or court stenographer shall record all of the proceedings, including the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements, and arguments of counsel.
This court has previously held that "[a] slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal would not cause us to reverse defendant's conviction." State v. Castleberry, XXXX-XXXX p. 29 (La.4/13/99), 758 So.2d 749, 773, cert. denied, 528 U.S. 893, 120 S.Ct. 220, 145 L.Ed.2d 185 (1999), quoting State v. Allen, XXXX-XXXX (La.9/5/96), 682 So.2d 713 (internal citation omitted). An incomplete record may be adequate for appellate review. Castleberry, XXXX-XXXX p. 29, 758 So.2d at 773; State v. Hawkins, XXXX-XXXX p. 8 (La.1/14/97), 688 So.2d 473, 480. A defendant will not be entitled to relief on the basis of an incomplete record absent a showing that he was prejudiced by the missing portions of the record. Id.
(1) With regard to transcripts of missing bench conferences, this court has previously ruled on this issue as follows:
This Court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843's description of "objections" and "arguments" will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. . . . Similarly, Art. 1, § 19's command to record "evidence" does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843.
State v. Hoffman, XXXX-XXXX p. 50 (La.4/11/00), 768 So.2d 542, 586-587, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
The record shows that the trial court place on the record, usually while the jury was taking a break or otherwise dismissed, any objections raised in the unrecorded bench conferences, and its ruling on those objections. After the first day of testimony, the trial court placed on the record, after the jury had been dismissed for the evening, the objections which had been raised earlier in the day. The trial court explained:
These objections were made timely and contemporaneously when the occurrence of the objection took place {sic; and} are consistent with this Court's procedure, this section of the Court's procedure. We discussed this at side bar, the Court made a ruling, and they have been preserved for any appellate reason.[101]
After the day's objections had been placed on the record, the trial court continued:

*626 Court: Counsel, all of you with the exception of, I think, [one of defendant's counsel], know how I do things. If they are really what I call serious substantive type of objections, I would have stopped and we would have put them on the record at that time. And anytime you feel strongly about your objection and do want to put them on the record, have no reluctance to ask. But I consider the general run-of-the-mill type objection, it saves time for the Court. I know it makes you have to think and reflect back at the end of the day, but thank you for your cooperation.
Defense counsel: Judge, just for the record, I also made an objection to the leading question by the state which was sustained with a smile.
Court: Those kind of questions I rarely if ever put on the record, but that's fine. . . . [102]
In Hoffman, where a similar procedure was utilized for substantive objections, this court implicitly approved this manner of recording objections. See Hoffman, XXXX-XXXX p. 50, 768 So.2d at 587.
For other, non-substantive, objections in Hoffman, which were not discussed on the record, this court found that "nothing in the record suggests the unrecorded conferences had a discernible impact on the proceedings nor does the defendant point to any specific prejudice." Id. The same conclusion may be drawn here. The defendant points to one instance where the prosecutor could not remember the substance of an earlier objection and asserts generally that perhaps all of the objections may not have been noted. Our review of the record does not find a discernible impact on the proceedings in these instances, nor can we discover any specific prejudice suffered by the defendant. Defense counsel, and the state, were always given an opportunity to note their objection and what had been discussed on the record. The record is clear that defense counsel here, as in Hoffman, acquiesced in the trial court's procedure. Compare Hoffman, XXXX-XXXX p. 51, 768 So.2d at 587.
(2) With regard to the missing transcript of the defendant's arraignment, our review of the minutes does not support the defendant's contention that this portion of the record is material or necessary to a full appeal. See State v. LaCaze, XXXX-XXXX p. 18 n. 27 (La.1/25/02), 824 So.2d 1063, 1077 n. 27, cert. denied, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002) (where the appellate record failed to contain a transcript of the defendant's arraignment). The minute entry of the defendant's arraignment shows that the defendant was represented by counsel and pleaded not guilty.[103] At the beginning of the trial, the court clerk read out the indictment against the defendant and informed the jury that the defendant had pleaded not guilty.[104] The defendant does not point to any prejudice based on this omission. We can discern no reason to reverse the defendant's conviction and sentence on this basis.
(3) With regard to hearing transcripts involving the question of the conflict of interest with counsel initially appointed to represent the defendant, the defendant fails to show how a lack of transcripts at these early proceedings affects this court's appellate review. From the record, we can discern that the Caddo Parish Public Defender's Office was already representing a family member of the victim. To *627 ensure that the trial counsel was not influenced by that relationship, the trial court appointed private counsel to represent the defendant.[105] Appellate counsel fails to show what additional information transcripts would provide as to this issue immaterial to appellate review.
(4) With regard to missing transcripts of pretrial proceedings, the defendant points to court dates which have no corresponding transcription and gaps in record. This court has previously held that where minute entries show relatively minor events, or where there are "gaps" in the record, such inconsequential omissions merit no relief. LaCaze, XXXX-XXXX p. 17, 824 So.2d at 1076-1077. Our review of the record shows that several of the minute entries show merely that trial proceedings were continued to other dates. Otherwise, the proceedings documented by minute entries only show relatively minor events which occurred pretrial. Moreover, merely because there were gaps, or spaces of time which appear "long" to appellate counsel, does not mean that there were unrecorded hearings taking place. Appellate counsel does no more than raise unsupported speculations which cannot stand as the basis for relief.
(5) With regard to a handout given to potential jurors during voir dire, the record shows that no copy of the handout was included in the record. However, it is clear from the record that the prosecutor gave to the potential jurors a handout of criminal statutes which included the definition of first degree murder.[106] The defendant complains that the jurors may have been exposed to other aggravating factors contained within the statutory language of La. R.S. 14:30(A), specifically the aggravating factor that the victim was 65 years of age, which injected an arbitrary factor into his trial where the victim was days away from her 65th birthday.
The defendant appears to raise again his argument with regard to Assignment of Error 11, which was previously addressed and found to be without merit. Insofar as the record lacks the handout itself, the defendant is not entitled to relief. In State v. Bridgewater, XXXX-XXXX (La.1/15/02), 823 So.2d 877, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003), the appellate record did not contain the actual jury note which was sent out of deliberations. This court found that the omission was immaterial where the trial judge read the contents of the note into the record. Bridgewater, XXXX-XXXX p. 31, 823 So.2d at 902. Similarly, here, the prosecutor discussed on the record the portions of the first degree murder statutes applicable to the case and specifically told the jurors to disregard the inapplicable portions of the statutes. The mere fact that the jurors were given the handout does not automatically suggest that the potential jurors made any improper conclusions. Further, the jurors who were selected to deliberate on this case were properly instructed by the trial court as to the applicable portions of the law which they were to consider in their deliberations.
(6) With regard to the jury's guilt phase verdict form, the defendant contends that the appellate record does not contain the portion of the verdict showing the unanimous finding of the jury and signed by the jury foreperson. The defendant's contention is factually inaccurate. The record does contain a copy of the guilt phase verdict, hand-written by the foreperson and signed by her. This information is found on the back of page 445 in Vol. 4 of *628 the appellate record. Obviously, the clerk of court made a copy of this two-sided document and placed it in the record. Appellate defense counsel failed to look on the back of the page, despite a clear written instruction on the front of the page to the jury that the verdict should be written on the back.
(7) With regard to the existence of transcripts for a hearing at which the defendant alleged the ineffective assistance of his trial counsel, the record does not indicate that a hearing on that issue ever occurred. Instead, the defendant's pretrial ineffective assistance of counsel claims were addressed by the trial court, on the record. The defendant filed no further motions regarding ineffective assistance and, thus, appeared satisfied with the trial court's determination of the issue. The issue was not raised again until the instant appeal. Considering appellate counsel's insistence that ineffective assistance of counsel claims are not being raised in this appeal, the defendant has not shown how he is prejudiced by the failure to hold a hearing or the non-existence of transcripts if such a hearing occurred.
(8 and 9) With regard to post-trial hearing transcripts, the defendant complains about minute entries that have no corresponding transcription and refers to transcripts which were requested by the defense but not made a part of the appellate record.
The record shows that the minute entries state that proceedings were continued on those dates, often at the request of the defense. Moreover, the appellate record is clear that trial defense counsel filed a motion seeking transcripts of the entire trial to comb through them for issues to raise in the defense's post-verdict motions for new trial and for acquittal. The trial court denied that motion, but granted the defense's alternative motion to have the testimony of certain specified witnesses transcribed. The defense indicated they had no objection to that ruling by the trial court.[107] Later, at a hearing set on the post-verdict motions, defense counsel submitted the motions to the court as they existed, stating:
A review of the transcript that was made available to us revealed no additional items that we felt would assist the Court in this. My notes I thought had reflected otherwise, and upon reading the transcript I am convinced that those issues, while they may be issues for appeal, ar[are] not issues for the motion that is pending befor[before] the Court; and therefore, Mr. Draughn has instructed us to submit the motions as they exist and ask that the Court rule on them.[108]
Considering the fact that these post-trial issues were resolved to the satisfaction of the defense, and the fact that the defendant raises no post-trial issues on review, the defendant has failed to allege that these allegedly missing post-trial transcripts of testimony or transcripts of proceedings were "material" to proper appellate review. LaCaze, XXXX-XXXX p. 19, 824 So.2d at 1078. In fact, the record makes plain that the transcripts of testimony transcribed for counsel were merely the actual testimony of trial witnesses. The appellate record contains all of the testimony of all of the witnesses testifying at trial. Consequently, there can be no prejudice to the defendant here because the record actually contains the information which the defense claims is missing.
With regard to the defendant's allegations as a whole as to the state of the *629 appellate record, this court has previously focused our inquiry on appellate review, as follows:
The crucial issue is not the amount or number of omissions but rather whether the omissions are material and caused prejudice to the defendant. The determination of whether the omissions are material must be made on a case by case basis. The critical inquiry is whether the defendant's right to judicial review guaranteed by La. Const. art. 1, § 19 can be performed or is the record so inadequate that the defendant's constitutional right to judicial review is prejudiced. Defendant must establish that he was prejudiced by the missing portions of the transcript.
State v. Boatner, XXXX-XXXX p. 5-6 (La.12/3/03), 861 So.2d 149, 153. Here, we find the record is wholly adequate for review on appeal; the testimony of all witnesses were identified and transcribed. The defendant has failed to demonstrate any reasonable likelihood that he suffered prejudice resulting from the inadequacy of the record. Boatner, XXXX-XXXX p. 6, 861 So.2d at 153.
Cumulative error
Assignments of Error 26 and 27
The defendant complains that his guilt phase and penalty phase were suffused with error. He urges that, even if individually none of the errors arising in this matter warrant reversal, that he should be granted relief due to the cumulative effect of the errors in this case.
Our review of all of the defendant's assignments of error failed to uncover reversible error. This court has previously maintained that "the combined effect of the incidences complained of, none of which amounts to reversible error [does] not deprive the defendant of his right to a fair trial." State v. Copeland, 530 So.2d 526, 544-545 (La.1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1558, 103 L.Ed.2d 860 (1989), quoting State v. Graham, 422 So.2d 123, 137 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).
Finding that none of the assignments of error raised by the defendant on appeal show reversible error, we now review the record to determine if the sentence of death imposed in this case is constitutionally excessive.

CAPITAL SENTENCE REVIEW
Under La.C.Cr.P. art. 905.9 and La. Sup.Ct. Rule 28, this court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has submitted a Uniform Capital Sentence Report (UCSR), as required by La. Sup.Ct. Rule 28, § 3(a), and the Department of Public Safety and Correction submitted a Capital Sentence Investigation (CSI). These documents reveal that the defendant, Darrell Dewayne Draughn, was 29 years of age at the time of the offense. He was born in Shreveport, Louisiana, and had lived all of his life in that area. He is one of three sons born from the union of his mother and father, who never married. One of the defendant's brothers was murdered in 1993, and the other brother still lives with their mother. The defendant's father has never been a major part of his life. Both of his parents are still living.
*630 The defendant completed the 11th grade but never attempted to obtain a GED. He has worked as a lawn care worker and for two moving companies, on-and-off, although the dates that he did this work were not known.
The defendant has never been married but has one son. The age of this child is unknown and the defendant was not contributing to the support of this child at the time of the offense. The son lives with his mother.
The defendant has no physical or mental health problems. Sanity was not raised as an issue in this case.
According to the UCSR and CSI, the defendant had no juvenile criminal record, but had several adult convictions and unresolved charges. In 1989 he pleaded guilty to possession of drug paraphernalia and received a four month suspended sentence with one year probation. In 1992, the defendant pleaded guilty as charged to possession with intent to distribute cocaine. He was sentenced to five years imprisonment at hard labor, suspended, with four years probation. In February 1994, the defendant was charged with simple battery on a police officer and resisting an officer. No disposition was found on those charges. In August 1994, the defendant was found guilty of "misrepresentation," sentenced to 60 days suspended sentence and two years unsupervised probation. In October 1999, the defendant was charged with the aggravated battery of Willie Bush. This charge was dismissed following the present conviction. In August 2000, the defendant was charged with the second degree murder of Justin Bradley. This charge was also dismissed following the defendant's sentence of death for the instant offense.

Passion, Prejudice or other Arbitrary Factors
The defendant is an African American man, who was 29 years old at the time of his offense. The murder victim, Lauretta White, was a 64 year old African-American woman. Both the defendant and the victim belonged to the same racial group. Race was not raised as a factor in this trial. There is no evidence of pretrial publicity that could have tainted the jury pool, and no change of venue was requested. The jury which determined the defendant's guilt and sentence consisted of 11 white jurors and 1 African American juror. According to the trial court in the UCSR, there was no evidence that members of the defendant's race were systematically excluded from the jury. This conclusion was similarly found by this court in its determination of Assignments of Error 5 and 6.
The defendant raised several issues on appeal which he claimed injected arbitrary factors into his trial; however, each of these allegations have been addressed in previous assignments of error and have been found to be without merit. No passion, prejudice or arbitrary factors are apparent in this appeal.

Aggravating Circumstances
The jury unanimously found that the murder was committed during the perpetration or attempted perpetration of an armed robbery, first degree robbery or simple robbery, and that the offense was committed in a heinous, atrocious or cruel manner. As previously discussed in Assignments of Error 1 and 4, there was constitutionally sufficient evidence to support the aggravating circumstance that the murder was committed during the perpetration or attempted perpetration of a robbery. We also find constitutionally sufficient evidence to support the aggravating circumstance that the murder was committed *631 in an especially heinous, atrocious or cruel manner.
This court has given the statutory aggravating circumstance of heinousness a narrow construction, requiring "that to be valid there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death." Manning, XXXX-XXXX p. 67-68, 885 So.2d at 1103; see also State v. Brogdon, 457 So.2d 616, 630 (La.1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2345, 85 L.Ed.2d 862 (1985). "Torture requires evidence of serious physical abuse of the victim before death." Manning, XXXX-XXXX p. 69, 885 So.2d at 1104; State v. Sonnier, 402 So.2d 650, 659 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983). In addition, "[t]his Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner." Manning, XXXX-XXXX p. 68, 885 So.2d at 1103. A victim's "awareness of impending doom" is relevant to a finding of heinousness. Manning, XXXX-XXXX p. 70, 885 So.2d at 1104.
Dr. McCormick testified as to Ms. White's injuries. She had been stabbed or cut 61 times. Some of the cuts were shallow but others were deep stab wounds. Thirty-four of these stabbing and cutting wounds were on the head and face, all but one to the right side. Other stab wounds were to her chest, abdomen and right foot. There were multiple stabbing wounds to both of her arms and hands, primarily on the palms of her hands. There were also contusions and abrasions found on her face, the right side of her chest, her left forearm and her knees. The contusions on her face were the result of blows to her head.
Two of the deep stab wounds on the right side of her neck cut the right jugular vein and another cut the right carotid artery. Ms. White eventually died from the loss of blood from these stab wounds, as these vessels carry the entirety of the blood to the right side of the head, face and brain. There were four stab wounds around her right eye, the only eye out of which she could see, and more stab wounds on the right side of her face, around her right ear, down the right side of her neck and on the top of her right shoulder. There were at least two deep stab wounds through her right cheek that went through the cheek and into the tongue. There was a deep stab wound on the right side of her breast that went six inches deep into her chest. There was also a stab wound above her right collarbone that went down into the chest that was five inches deep or more.
Dr. McCormick testified that the wounds to her hands, fingers, forearms and the bottom of her foot were all defensive wounds. From the injuries to Ms. White's body, Dr. McCormick could tell that she had put up her hands, her arms, her feet, whatever she could to ward off the blows. Ms. White "was fighting for her life at the time she was being attacked."[109] She continued to try to fight off her attacker when she was lying on the ground, which is how the instep of her foot became cut.
Dr. McCormick stated that the wounds to her head and neck were downward stabbing motions, from which the jury could infer that Ms. White was shorter than her attacker. The autopsy report stated that Ms. White was 5'5" tall; the arrest report shows that the defendant is 6'0" tall.
*632 Dr. McCormick testified that Ms. White lived for a period of time throughout the attack. The wounds on Ms. White's arms and hands were inflicted at a different time than the wounds on her face. He stated that she was first stabbed in the side of the face, chest, abdomen and hands and she tried to defend herself. She then went down, put up a foot and got cut on her right foot. Dr. McCormick affirmed that she would have sustained and felt all of the 61 stab wounds and that these injuries would have inflicted a great deal of pain and suffering.
Dr. McCormick also testified that Ms. White had otherwise been an extremely healthy woman. She had no other natural disease that was significant and would have lived for many years.
Captain Mark Rogers, who testified for the state as an expert in crime scene analysis and blood stain pattern analysis, testified that there was a lot of movement in connection with the blood stains at the crime scene. In his expert opinion, this meant that Ms. White was struggling with her attacker, continued to move after she began to bleed and was alive throughout the attack. The blood stains left in the kitchen showed that Ms. White, at some point during the attack, drew up her legs and bent over in a defensive position in an attempt to shield herself.
We find the evidence to be abundant, and constitutionally sufficient, that the murder was committed with the pitiless infliction of unnecessary pain or serious bodily abuse. Ms. White's death was particularly painful and was carried out in an inhumane manner. The evidence establishes that she was alive throughout the attack and attempted to fight off her murderer until she was exhausted through blood loss which eventually caused her death. Consequently, the jury properly found the aggravating circumstance that the murder was committed in an especially heinous, atrocious and cruel manner.
We find that the defendant's death sentence is firmly grounded on the finding of the two aggravating circumstances found by the jury.

Proportionality Review
Although the federal constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991). This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979).
The state's Sentence Review Memorandum reveals that since 1976, there have been 40 first degree murder convictions in the First Judicial District, which consists of Caddo Parish, including the instant offense. The death penalty was imposed in fifteen of those cases.
The state contends that the defendant repeatedly stabbed an elderly woman, his neighbor, to death in her own home, so that he might steal a few dollars. The defendant then committed an unrelated murder a few months later. The state submits that the death penalty is not disproportionate for this offense and this offender. We will review the other First Judicial District cases to determine whether the death sentence imposed in this case is disproportionate to other death *633 sentences imposed in the First Judicial District.
In State v. Campbell, 1st Judicial District Court, Docket No. 220,544 (appeal pending), the defendant robbed a cashier and then, after the cashier fully complied with his demands, shot the cashier in the chest. The jury found Campbell committed the murder in the course of an armed robbery. Campbell's appeal is presently pending in this court. State v. Campbell, 06-KA-0286.
In State v. Code, 627 So.2d 1373 (La. 1993), cert. denied, 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994), a serial killer was convicted of brutally murdering four people. Billy Joe Harris was shot four times and had his throat cut. Jerry Culbert was shot once in the head as he slept. Vivian Chaney was brutally beaten, then strangled and drowned. Carlitha Chaney was slashed repeatedly across her throat, nearly decapitating her. Evidence was presented that he murdered four other people, as well. The jury found three aggravating factors in sentencing Code to death: (1) that Code created a risk of death to more than one person, (2) that three of the four murders was committed in a heinous, atrocious or cruel manner, and (3) that Code was engaged in the perpetration of armed robbery.
In State v. Coleman, 1st Judicial District Court, Docket No. 226,816 (appeal pending), the defendant was convicted for the murder and attempted murder of an elderly couple. Coleman shot the husband at near contact range under the chin with a .380 caliber handgun. He was also brutally stabbed multiple times. The wife was shot in the head and left for dead. She was discovered four days later and miraculously survived. She lives today in an impaired state as a result of the gunshot wound to her head. In the penalty phase, evidence of an unadjudicated homicide was presented. Coleman's appeal is pending in this Court. State v. Coleman, 06-KA0-637.
In State v. Cooks, XXXX-XXXX (La.9/9/98), 720 So.2d 637, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999), the defendant, known as "Mad Monsta Crip," and at least five others, invaded Joe Frazier's house and forced him and two other victims to lie on the floor. Cooks repeatedly shot and/or ordered the others to shoot the three people, one of whom died. Cooks stole marijuana from the house. Cooks wrote letters threatening the lives of the surviving victims. In the penalty phase, evidence was introduced regarding three prior offenses for simple burglary, aggravated assault and attempted second degree murder, in which Cooks stabbed another inmate while awaiting trial. The jury found Cooks committed a murder during the perpetration or attempted perpetration of an armed robbery, first degree robbery or simple robbery, and knowingly created a risk of death to more than one person.
In State v. Davis, XXXX-XXXX (La.5/23/94), 637 So.2d 1012, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994), the defendant committed two separate murders on two consecutive days in the course of two armed robberies. The cases were tried together and the jury found Davis guilty and sentenced him to death on both counts. The jury found both murders were committed during the perpetration of armed robberies. In addition, the jury additionally found that one of the murders was committed in a heinous, atrocious or cruel manner.
In State v. Deal, XXXX-XXXX (La.11/28/01), 802 So.2d 1254, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002), the defendant was convicted of the first degree murder of his 11-week-old son, when he stuffed a wadded up paper *634 towel in his son's mouth and slammed him into a crib when the boy would not stop crying. The jury found the aggravating circumstance that the victim was under the age of 12 years old.
In State v. Edwards, XXXX-XXXX (La.7/2/99), 750 So.2d 893, cert. denied, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999), the defendant and at least one unidentified man entered a family's home during a home invasion. Edwards shot the wife twice in the head, killing her. He shot at the husband, breaking his arm, and pistol-whipped him with his own weapon. The jury found as aggravating factors that Edwards was engaged in the commission or attempted commission of armed robbery or aggravated burglary and that Edwards knowingly created a risk of death or great bodily harm to more than one person.
In State v. Felde, 422 So.2d 370 (La. 1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983), the defendant was arrested for drunkenness at a pizza restaurant. Felde, an escapee from a Maryland penitentiary where he had been serving time for manslaughter and assault, shot and killed the Shreveport police officer who was transporting him to jail after his arrest with a pistol which had been hidden in his trousers. The jury found as an aggravating circumstance that the victim was a peace officer engaged in his lawful duties.
In State v. Ford, 489 So.2d 1250 (La. 1986), cert. granted, jmt. vacated by, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987), on remand, 503 So.2d 1009 (La. 1987), the defendant was found guilty of the first degree murder of a jeweler. The jury found as an aggravating circumstance that the murder was committed in the perpetration of an armed robbery. This court affirmed but the Supreme Court vacated the original judgment and remanded to the district court to conduct an evidentiary hearing on the claim that the state exercised jury challenges in a racially discriminatory manner prohibited by Batson.
In State v. Hampton, XXXX-XXXX (La.4/23/99), 750 So.2d 867, cert. denied, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999), the defendant was convicted of the first degree murder of the victim during the course of an armed robbery. The victim, a clerk in a liquor store, was shot three time in the back without warning. During the penalty phase, evidence of an unadjudicated armed robbery, committed three days before the murder, was also presented. The jury found as an aggravating circumstance that the murder was committed during the perpetration or attempted perpetration of an armed robbery, first degree robbery or simple robbery.
In State v. Irish, 2000-2086 (La.1/15/02), 807 So.2d 208, cert. denied, 537 U.S. 846, 123 S.Ct. 185, 154 L.Ed.2d 73 (2002), the defendant lured his victim into his home and ambushed him. A co-perpetrator shot the victim once in the stomach with a 12 gauge shotgun and then Irish shot the victim again in the head with a rifle as the victim pleaded for his life. The jury found that the murder was committed during the perpetration or attempted perpetration of an armed robbery.
In State v. Tyler, XXXX-XXXX (La.9/9/98), 723 So.2d 939, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999), the defendant ordered the manager and two employees of a fast food restaurant to lie down in a freezer and shot each of them in the back of the head. The manager was killed, but the two employees survived the injuries. The jury found Tyler committed the murder during the perpetration or attempted perpetration of an armed robbery and that Tyler knowingly created a risk of death or great bodily harm to more than one person.
*635 In State v. Williams, XXXX-XXXX (La.11/1/02), 831 So.2d 835, the defendant shot a pizza delivery person multiple times after demanding money. The jury found that Williams murdered his victim during the perpetration or attempted perpetration of an armed robbery. This court affirmed the conviction on appeal and remanded for a hearing to determine if Williams was mentally retarded under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). On remand, the trial court found Williams to be retarded; Williams' death sentence was vacated and he was re-sentenced to life imprisonment. See State v. Williams, XXXX-XXXX (La.2/17/06), 921 So.2d 105.
In State v. Wilson, XXXX-XXXX Louisiana Supreme Court, (appeal pending in court of appeal), the defendant kidnapped the victim, forced her to withdraw money from an ATM, raped her and then shot her in the head. A jury found the defendant committed the killing in the course of a robbery, rape and kidnapping. Wilson's death penalty sentence was vacated in light of Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), because Wilson was a minor at the time of the offenses. Wilson was resentenced to life imprisonment. According to the District Attorney's office, his appeal is currently pending before the Second Circuit Court of Appeal.
Given the facts and circumstances of this case, and comparing this case to the other first degree murder cases in the First Judicial District, we find that the imposition of the death penalty in this case is not disproportionate to other cases in the First Judicial District where a sentence of death has been imposed.
Moreover, comparing the facts and circumstances of this case to other first degree murder cases in Louisiana as a whole, we find the cases are legion in which juries have sentenced to death defendants whose murders have been found to have been committed during the perpetration or attempted perpetration of a robbery. See, e.g. State v. Ball, 2000-2277 (La.1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 107 (2002) (patron robbed bar and killed beer delivery man during course of robbery); State v. Wessinger, XXXX-XXXX (La.5/28/99), 736 So.2d 162, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999) (ex-employee returned to restaurant, shot and killed two people, and injured another during course of an armed robbery); State v. Broadway, 1996-2659 (La.10/19/99), 753 So.2d 801, cert. denied, 529 U.S. 1056, 120 S.Ct. 1562, 146 L.Ed.2d 466 (2000) (defendant and co-defendant Brumfield shot and killed police officer escorting grocery store manager making a night deposit); State v. Brumfield, 1996-2667 (La.10/20/98), 737 So.2d 660, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999) (same), and cases cited in each.
In addition, comparing this case to other first degree murder cases in Louisiana as a whole, we also find the cases are legion in which juries have sentenced to death defendants where the victims experienced great pain and were aware of their impending doom. See State v. Rault, 445 So.2d 1203, 1219 (La.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 225, 83 L.Ed.2d 154 (1984) (victim was raped, strangled, stabbed in the neck and shot twice); State v. Willie, 436 So.2d 553, 556-557 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped and had her throat repeatedly slashed); State v. Moore, 414 So.2d 340, 348 (La. 1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983) (victim received thirteen stab wounds and died slowly *636 "with awareness of her impending death"); State v. Hoffman, XXXX-XXXX (La.4/11/00), 768 So.2d 542, cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000) (victim carjacked, kidnapped, robbed, raped and shot execution style after which she survived for a few minutes in a remote area completely nude on a cold November evening); State v. Legrand, XXXX-XXXX (La.12/3/03), 864 So.2d 89, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005) (victim stabbed over 25 times with a variety of utensils including plastic and wooden handled knives, screwdrivers and scissors, three of which stab wounds were fatal); State v. Manning, XXXX-XXXX (La.10/19/04), 885 So.2d 1044, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005) (abduction and brutal beating of an elderly, 62-year old woman, left in a remote location), and cases cited therein.
A comparison of this case with other first degree murder cases in the First Judicial District where death was imposed, as well as with other first degree murder cases in Louisiana as a whole where the same aggravating circumstances were found, convinces this court that the death sentence imposed in this case is not a disproportionately harsh sentence, considering the offense and the offender.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
NOTES
[1] Ms. White's first name is also spelled "Loretta" in the record. However, "Lauretta" is the spelling on Ms. White's death certificate. See State's Exhibit 6.
[2] La. Const. art. 5, § 5(D) provides in pertinent part: ". . . a case shall be appealable to the supreme court if . . . (2) the defendant has been convicted of a capital offense and a penalty of death actually has been imposed."
[3] La. R.S. 14:30(A) provides in pertinent part:

A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of . . . armed robbery . . . first degree robbery, simple robbery. . . .
[4] To one of the investigators, Cornell White stated that his mother commonly kept a small amount of cash  $20 to $40  in her purse and that she did have credit cards and a checkbook. Vol. 9, p. 1675.
[5] See State v. Higgins, XXXX-XXXX (La.4/1/05), 898 So.2d 1219, cert. denied, ___ U.S. ___, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); State v. Bright, 1998-398 (La.4/11/00), 776 So.2d 1134; State v. Love, 410 So.2d 1045 (La. 1982).
[6] See Vol. 3, p. 509-532.
[7] Vol. 10, p. 1738-40, 1744-46, 1767.
[8] See Vol. 2, p. 274 (handwritten motion dated November 19, 2002) and Vol. 2, p. 277 (handwritten motion dated February 18, 2003).
[9] See Vol. 13, March 25, 2003 hearing, p. 5-6.
[10] See Vol. 2, p. 438-440.
[11] The record shows that private counsel was appointed to represent the defendant when it was discovered the defendant had a conflict of interest with the local indigent defender board.
[12] See Vol. 3, p. 540-544.
[13] See Vol. 12, p. 2238-2239.
[14] See Vol. 1, p. 9 (7/31/2003 entry).
[15] Defense Brief, p. 25, n. 19 (emphasis in original).
[16] Defense Reply Brief, p. 5.
[17] In the fourth day of voir dire, the attorneys agreed to increase the number of prospective jurors questioned for cause challenges from the initial six to ten. See Vol. 3, p. 552-554; Vol. 5, p. 1034-1035.
[18] See La.C.Cr.P. art. 788(B) provides that, if prospective jurors are not first tendered to the state and then to the defense for challenges, then selection shall proceed by local rule providing for a system of simultaneous exercise of challenges.
[19] See Vol. 7, p. 1260.
[20] Vol. 7, p. 1260-1262.
[21] Vol. 7, p. 1262.
[22] Vol. 7, p. 1262-1263.
[23] Vol. 7, p. 1263.
[24] Vol. 7, p. 1264.
[25] Vol. 7, p. 1264.
[26] See Vol. 7, p. 1257, 1264-1265.
[27] Vol. 7, p. 1265.
[28] Vol. 7, p. 1265.
[29] Vol. 7, p. 1266.
[30] Vol. 7, p. 1266.
[31] Vol. 7, p. 1266-1267.
[32] Vol. 7, p. 1267.
[33] Johnson, 545 U.S. at 168, 125 S.Ct. 2410 (internal citation omitted).
[34] Johnson, 545 U.S. at 170, 125 S.Ct. 2410.
[35] Compare with Johnson, 545 U.S. at 164, 125 S.Ct. 2410, where Johnson, a black male, was convicted of second-degree murder and assault on a white 19-month old child, resulting in death.
[36] See State v. Williams, 524 So.2d 746 (La. 1988) (Batson objection timely if made "before the entire jury panel is sworn").
[37] See Johnson, 545 U.S. at 165, 125 S.Ct. 2410.
[38] See Vol. 3, p. 706 (agreement on all except for 2 submitted by defense, denied by trial court); Vol. 4, p. 768, 797, 914, 949, 969 (agreed on all except for 1 raised by defense counsel, which prosecutor agreed juror said what defense counsel said, granted by trial court); Vol. 5, p. 1011, 1031; Vol. 6, p. 1122, 1151, 1177, 1248 (agreement on all except for two cause challenges raised by defense, denied by trial court).
[39] See Rule 28, Rules of Supreme Court of Louisiana.
[40] Compare with Johnson, 545 U.S. at 165, 125 S.Ct. 2410.
[41] Johnson, 545 U.S. at 165, 125 S.Ct. 2410.
[42] Although appellate defense counsel raises this argument, there is no citation to the record to support the allegation. Our thorough review of the voir dire record negates this allegation. Compare with Miller-El, 545 U.S. at 249, 125 S.Ct. 2317 (white prospective jurors not asked to explain answers while minority prospective jurors are questioned intensely); 545 U.S. at 258, 125 S.Ct. 2317 (minority prospective jurors read a "graphic script" regarding imposition of the death penalty while non-minority prospective jurors were given a general explanation of capital punishment).
[43] Compare Miller-El, 545 U.S. at 261-263, 125 S.Ct. 2317.
[44] Compare Miller-El, 545 U.S. at 253, 125 S.Ct. 2317.
[45] Compare Miller-El, 545 U.S. at 263-264, 125 S.Ct. 2317.
[46] See La.C.Cr.P. art. 795(C); State v. Elie, XXXX-XXXX (La.7/10/06), 936 So.2d 791.
[47] Vol. 2, p. 367-368. The defendant does not complain about any of the other evidence of other crimes which was introduced at the penalty phase, and so waives argument as to these issues.
[48] See Vol. 10, p. 1930. This circumstance was part of the basis for the defendant's allegation in his motion for new counsel that his counsel was overburdened and ineffective, previously discussed in a separate assignment of error.
[49] Vol. 10, p. 1928.
[50] Vol. 10, p. 1930-1950.
[51] Vol. 2, p. 465; State v. Draughn, No. 37885-KW (June 27, 2003).
[52] See Vol. 11, p. 2107.
[53] At the time of trial, Detective Jeter was working with the Gallatin County Sheriff's Department in Montana.
[54] Two other state witnesses presented evidence with regard to the Bradley homicide. Lieutenant Kent obtained the defendant's shoes after his arrest and took his picture. Corporal Rachal transferred the defendant's shoes and the other evidence collected in this case to the crime lab for analysis.
[55] The evidence presented at the Jackson hearing outside the jury's presence was actually stronger than the above-described evidence presented at the penalty phase. At the Jackson hearing, the defense called Stan Fuller as a witness. Mr. Fuller, a local sandwich maker, testified that he had been speaking on the telephone with Mr. Bradley about a sandwich order when their conversation was interrupted by a knock at Mr. Bradley's door. Mr. Bradley told Mr. Fuller that Darrell Draughn was at his door and that he had to see what the defendant wanted.

After stating that he had to tell Mr. Bradley something about his food order, Mr. Fuller told the jury he rode his bicycle the short distance to Mr. Bradley's house. On the way there, he saw the defendant walking on the side of the road crying, looking dazed and carrying a shotgun similar to the one he knew Mr. Bradley owned. Mr. Fuller knew the defendant both from the neighborhood and from selling him food previously.
Mr. Fuller was the other individual who walked into the victim's house as described by Ms. Clements. Mr. Fuller noticed that Mr. Bradley was wearing shoes at that time and he left to call the police. As Mr. Fuller was leaving Mr. Bradley's house, he encountered Mr. Washington and Ms. Clements, who were just returning. Mr. Fuller testified that Mr. Washington told him they had heard a gun shot. Mr. Fuller called the police minutes later and told them he had an idea who had killed Mr. Bradley.
In determining the limitations on the testimony which he would allow the state to present to the jury, the trial court refused to allow the state to call Mr. Fuller because the state had not called him as its witness at the Jackson hearing. Nevertheless, the evidence presented by the state to the jury met the clear and convincing standard of proof.
[56] Vol. 10, p. 1875.
[57] Vol. 10, p. 1888.
[58] Vol. 10, p. 1888.
[59] Vol. 10, p. XXXX-XXXX.
[60] Vol. 10, p. 1891-1892.
[61] Vol. 10, p. 1894.
[62] Vol. 10, p. 1894-1895. Defense counsel erroneously attributed this statement to Detective McCarthy, when Corporal Duddy testified that no fingerprints were found on the purse and its contents, and that the items were not sent to the crime lab. Vol. 8, p. 1517-1518. The jury would have been aware that the purse and wallet were not part of the items sent to the lab for DNA testing as was done with every other piece of evidence with visible drops of blood or blood stains.
[63] Vol. 10, p. 1895.
[64] Vol. 10, p. 1895-1901.
[65] Vol. 10, p. 1901.
[66] None of the grounds for mandatory mistrial upon defense motion listed in La.C.Cr.P. art. 770 are at issue here because the prosecutor's remarks did not refer directly or indirectly to (1) race, religion, color or national origin; (2) another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible; (3) the failure of the defendant to testify in his own defense; or (4) the refusal of the judge to direct a verdict.
[67] Appellant's brief, p. 54.
[68] After the jury was dismissed to deliberate, the trial court stated: "The Court feels that given the totality of the circumstances, including the prejudicial effect, if any, that the Court is satisfied they're {sic: there are} not any, and the state's correction is sufficient. So the Court refuses or declines to admonish the jury." Vol. 10, p. 1916-1917.
[69] Vol. 10, p. 1906-1907.
[70] See La.C.Cr.P. art. 905.4(A)(10).
[71] Vol. 10, p. 1906-1907.
[72] Vol. 12, p. 2232.
[73] Vol. 2, p. 466.
[74] Vol. 9, p. 1590-1592.
[75] Vol. 9, p. 1601-1606.
[76] Vol. 9, p. 1608-1611.
[77] Vol. 9, p. 1611-1612.
[78] Vol. 9, p. 1612-1613.
[79] Vol. 9, p. 1614.
[80] The following exchange took place between defense counsel and the court:

Defense counsel: Your Honor, my bottom line is that I have my job to do in defending my client.
Court: Well, do it in context of what I said at the bench. What problem do you have with what I said at the bench in terms of your responsibility?
Defense counsel: None.
Court: Okay.
Defense counsel: But this is  what's now being said is different from that.
Court: No, it's not.
Defense counsel: This is the Court looking at me saying I want to get finished with this trial.
Court: That's true, and we are going to get finished with this trial. That's the bottom line.
Defense counsel: Judge, I don't have a problem with that. I'm here free of charge. I don't have a problem with the fact that this may eventually get over.
Court: As long as you don't have a problem with it, enough has been said.
Vol. 9, p. 1614-1615.
[81] Vol. 9, p. 1615.
[82] Vol. 12, p. 2197-2198.
[83] The defense's objection was as follows:

Court: Counsel, before we break there is one objection I do want to put on the record while we're still fresh. Mr. Clark, you want to note for the record the Court limiting your questioning of Ms. Clements regarding her arrest at the scene, the items which may or may not have been taken and any tests that may or may not have been taken on Ms. Clements or anyone else?
Defense counsel: That's correct, Your Honor. The Court called us to the bench and indicated that  I felt what the Court was telling me was that I was taking too long with the witness, asking too many questions and that was what I objected to. I feel as though I did not ask an extensive amount of questions of the witness. And I think to ask her  when all Detective Jeter had testified that he did not personally ask that any tests be run, my question to her was did any officer order or request that any tests for gunshot residue or any other type of test be taken. At that point the Court invited us to the bench and indicated that you felt that I was exceeding some time limit on questioning the witness and that's what I objected to.
Court: In the Court's opinion everything you said was accurate and correct in terms of what happened except the Court did not indicate any time limits. What the Court said in order to move the case along if there was a reason to ask as many questions to get to the bottom line then I said that's too many questions, move on. You can ask some general questions but the Court felt enough questions had been asked to establish what you wanted for those areas and the Court in all other respects agrees with everything you said about the Court calling you to the side bar for the purpose of limiting your line of questions as it relates to the arrest, items taken or not taken, or tests taken or not taken. With the understanding that enough general questions had been asked to establish that no tests had been taken and no other clothes had been taken and that the defendant {sic; witness} was not arrested. So I'm agreeing with you, everything you said was accurate except I didn't say I was trying to stick with any type of time limitations as if I was going to give you only X number of minutes to ask questions or you have to stop asking all questions, that's the only thing I want to make certain that the record is clear that we didn't discuss at side bar but everything else you said is correct.
Defense counsel: I would concur with the Court's statement that you imposed no number of minutes. I think it was certainly the impression that I left the bench with that the Court felt I was taking too long with a witness who is sitting there testifying that my client is guilty of some second murder. And I believe I have the right to present my case in the manner that I choose to ask my questions in the manner that I choose and not jump straight to some magical bottom line.
Court: And I agree with you 100 percent, [defense counsel], except the Court had indicated to you we were going to move on. Note objection to the Court's ruling with respect to the question. And you know ultimately my question is if the questions were not allowed to get to what you wanted to do, is there something that the Court limited that you did not get a chance to ask?
Defense counsel: Your Honor, I think under the type of discussion 
Court: No. Now is the time to say. For example, the test 
Defense counsel: That's what I'm trying to say, Your Honor.
Court: Were there some more tests that you needed to ask her about? If we're going to make a record, let's make a record. I got the impression that enough questions had been asked. Go ahead. I'll let you.
Defense counsel: Thank you. And I didn't mean to interrupt the Court. Any time that a discussion that we had is held and someone sitting on your side of that bench tells counsel move on, I'm tired of this, it has an impact. I don't are what you say, how you put it, it impacts what counsel is going to do or what he or she is thinking and you begin to alter what you had planned to do. There is an impact how be it ever so subtle that it can be, there is an impact.
Court: All right. I'll agree with you a hundred percent, [defense counsel]. Thank you.
Vol. 12, p. 2207-2209.
[84] Earlier in the penalty phase, the trial court had warned counsel:

Court: . . . Let me make certain and I said it several times at side bar, I want to make certain that I say it on the record in that you can have your objections noted on the record. We're taking too long and the Court is trying to move this proceeding. I don't want us to be here beyond today if at all possible on the penalty phase, on the sentencing. Now I understand that you want to be deliberate and thorough but in terms of what we've already heard, we don't need to ask certain questions in many different ways. I don't {sic; know} how to say it other than just interrupting you and asking you to move on to other things, but we've got to pick up our pace.
* * *
Defense counsel: Your Honor, speaking for myself, I mean this is the State's portion of this but I don't believe I can curtail anymore than I have the cross examination I am doing of these witnesses and do Mr. Draughn justice in my representation of him. And I understand the Court's desire to finish today but I cannot be called upon to do anything less than I am for him.
Court: That's why I want you to put it on the record because not only do I understand but appreciate your statements and I'm sure the State would echo the same on behalf of the State but I'm putting on the record so when I start helping you achieve that then there will be at least something on the record for any appellate review to indicate that I'm saying we've got to cut through the chase and get to the bottom line and ask the important questions. Any other comments we need to make on the record at this time? Because when I start doing it, I don't want you to say that you haven't had full argument on it.
Defense counsel: Well, Your Honor, at the point at which I'm told I cannot cross examine a witness any further that's when I wanted to take it up. I don't want to do it ahead of time because it hasn't occurred.
Court: What has occurred is the Court has instructed both Counsel that we intend to move at a better pace than we have this morning. That's what I'm saying.
Vol. 12, p. 2167-2168.
When defense counsel suggested that part of the problem for the pace was the fact that the court had spent a significant part of time doing other court business, the trial judge interrupted him to clarify:
Court: . . . It's not the time we started or the  what I'm saying is to get to the bottom line we have to be quicker and not have the luxury of asking a hundred questions when you can reduce it to the fundamental questions. That's what I'm saying. . . . I'm just trying to make a record now so when I start pushing us along there's a record of it. I want to make sure that the record is clear that the Court has indicated to Counsel that we've got to get to the bottom line on some of this and move on. I will note on behalf of the State and the Defense Counsel your objections to the Court pushing you and at some point limiting what you can ask." Vol. 12, p. 2168.
[85] At the time of trial, Mr. McCarthy was a regional supervisor of criminal investigations for an insurance company. Vol. 9, p. 1671.
[86] See Vol. 9, p. 1682.
[87] See Vol. 8, p. 1547-1560.
[88] La.C.Cr.P. art. 841 provides, in pertinent part: "An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor."
[89] Sgt. Bickham, Corporal Duddy and Mr. McCarthy.
[90] Vol. 8, p. 1419.
[91] Vol. 8, p. 1528-1530, 1543.
[92] Vol. 9, p. 1598-1599.
[93] Vol. 9, p. 1703.
[94] Vol. 9, p. 1702-1703.
[95] Vol. 10, p. 1915.
[96] Vol. 12, p. 2237.
[97] La.C.Cr.P. art. 801(C) provides: "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury."
[98] Vol. 3, p. 579, 631, 659-660; Vol. 4, p. 740-741, 747, 781, 926, 958-959; Vol. 5, p. 992, 994, 1020; Vol. 6, p. 1105, 1129-1130, 1161-1162; Vol. 7, p. 1291.
[99] Vol. 2, p. 464; Vol. 12, p. 2242. The jury also found the offense was committed in an especially heinous, atrocious and cruel manner. La.C.Cr.P. art. 905.4(A)(7).
[100] Vol. 1, p. 12.
[101] Vol. 8, p. 1567.
[102] Vol. 8, p. 1569.
[103] Vol. 1, p. 2, Minute Entry for 1/3/01.
[104] Vol. 8, p. 1412.
[105] Vol. 1, p. 14-16.
[106] Vol. 4, p. 807, 810.
[107] Vol. 13, p. 31.
[108] Vol. 12, p. 2269.
[109] Vol. 8, p. 1553.